Seafarer's name: Byron Chemaly

# Seafarer Employment Agreement

and

# Statement of Terms & Conditions

for permanent service on board

# M/Y FOUNTAINHEAD

Official number: 1010753
Flag & Registry: Cayman Island, Georgetown


EXHIBIT A

# Employment Agreement between:

**The Employer:**

| Name | R Operations Ltd |
|---|---|
| a registered company having its principal place of business in | |
| Employer's Address | c/o Campbell Corporate Services Ltd |
| | Scotia Centre, P O Box 268 |
| | Grand Cayman |
| | KY1-1104 |

And
**The Employee:**

| Full Name | Byron Chemaly |
|---|---|
| Address | 24 Soutpansberg Ext 6 |
| | White River |
| | 1240 |
| | |
| | South Africa |
| Passport number | ■■■■ |
| Nationality | South African |
| Date Of Birth | ■■■■ |
| Place Of Birth | Gauteng |

| Probationary Period | 3 Months |
|---|---|
| Capacity in which to be employed | Deckhand |
| Agreed Repatriation Destination | Nelspruit, South Africa |
| Annual Repatriation Flight Entitlement | One flight per annum following 11 months continuous service |
| Contact number for the competent authority for the Flag State: | Cayman Islands Registry Tel: +1 345-949-8831 or UK office +44 1489 799 203 E-mail: shipping.master@cishipping.com |

**Definition of terms used in this document:**

| **Employee or 'you'** means | The Seafarer |
|---|---|
| **Employer** means | R Operations Ltd |
| **Employment Agreement** means | This employment agreement as amended or varied from time to time |
| **Flag State** means | Cayman Islands |
| **General Terms and Conditions** means | The general terms and conditions which apply to the Employee's employment with the Employer attached as Schedule 1 of this Employment Agreement. |
| **Monthly Gross Salary** means | a consolidated monthly rate which includes the basic pay and other pay-related benefits; a consolidated wage includes compensation for all overtime hours which are worked and all other pay-related benefits |
| **Yacht** means | M/Y FOUNTAINHEAD |
| **Yacht Manager** means | Camper & Nicholsons International |

**The Shipowner:**

| Name (enter in full) | R. Operations Ltd. |
|---|---|
| a registered company having its principal place of business in | |
| Shipowner's Address (line 1) | c/o Cambell Corporate Services Ltd |
| (line 2) | Scotia Centre, P O Box 268 |
| (line 3) | Grand Cayman |
| (line 4) | KY1-1104 |

## Schedule A - Employee Specific Terms & Conditions

**It is agreed as follows:**

1. **Wages**

   1.1. You will be paid a monthly gross salary in arrears, being a consolidated wage of ▮▮▮ on or before the last banking day of each calendar month during the term of the Agreement by credit transfer directly to your nominated bank account.

   1.2. You will be provided with pay slips, being a monthly account of all payments due to you and the amounts paid, including all statutory required details (including but not limited to net wages, additional payments, permitted/statutory deductions, allotments and the rate of exchange used where payment has been made in a currency which is different from that agreed above).

   1.3. Your consolidated wage may be subject to review from time to time by the Employer and any resulting changes will be advised to you in writing and will be effective from the date specified by the Employer.

   1.4. Should the Employer make any overpayment to you or you owe any sums to the Employer then you agree that the Employer is authorized to deduct such amounts from your salary or wages until the amounts you owe to the Employer have been repaid in full.

   1.5. You are liable to meet your own personal tax and social security or similar liabilities in whichever jurisdiction they arise. Furthermore, you shall indemnify the Employer for and in respect of payment of any income tax, social security contributions and any other similar liabilities arising from or made in connection with any payment or benefit received by you in accordance with the terms of this Agreement. The Employer recommends that you seek appropriate professional advice in order to establish your personal liability in these matters, which you accept to be your sole responsibility. No deductions will be made by the Employer in respect of any liabilities that you may have regarding personal taxation, social security or other matters in the country of your domicile or residence, or other administration unless there is a statutory obligation to do so, of which the Employer is made aware of.

   1.6. One day's pay shall be calculated by multiplying your consolidated wage as agreed under clause 1.1 of the Employment Agreement (as may be modified by clause 1.3) by 12 months to get the annual gross salary, then dividing this result by 365 days. For the purposes of pro rata salary and leave pay calculations (including pro rata payments in lieu of notice periods or holidays due, or for excess holidays taken by you), this daily rate shall be multiplied by the outstanding number of days due, rounded up to the nearest half a day.

$$\frac{CW \times 12 \times N}{365}$$

Where CW = Consolidated Wage (being a Monthly Gross Salary)



$N$ = Number of days outstanding ($\leq 30$) rounded up to the nearest half a day.
Daily Rate = $CW \times 12/365$

## 2. Commencement & Period of Employment

1.1. Your employment begins 08 Dec 2018 on and will continue until terminated in accordance with the terms and conditions of your Employment Agreement and/or the General Terms and Conditions (as applicable). If your employment is subject to a Probationary Period, then the provisions of Clause 5 of the General Terms and Conditions shall apply.

1.2. The start date of this employment as stated in clause 2.1 is also the start date of your continuous employment for the purpose of calculating all statutory and contractual provisions. To the maximum extent permitted by law, no employment liabilities whatsoever arising out of any previous employment with any other employing entity associated with the Employer, Yacht Manager or any agent thereof will transfer to your new employment.

## 3. Entitlement to Leave

3.1. Your holiday entitlement on board the Yacht shall in the first instance be taken in strict agreement with the Employer and shall be the total sum of 42 calendar days per year of continuous employment onboard (accumulated at a rate of 3.5 days per month/or 30 days of continuous employment). This leave **includes** compensation for any Cayman Islands (Flag State) public and bank holidays whilst on duty. You will be paid your normal (or pro rata) consolidated wage in monthly arrears during such leave periods.

3.2. Annual leave shall not include: temporary shore leave granted, compensatory hours or days leave forming part of the agreed working pattern, periods of incapacity resulting from work related sickness or injury, travel days to and from the Yacht and any other extra period which is agreed between the Employer and the Employee. You will accrue annual leave during calendar days served onboard the Yacht, but not during normal travel days, sick leave or a period of "pay in lieu of notice" at your repatriation destination (as referred to above).

3.3. If your employment commenced or terminates part way through your holiday year, your entitlement to paid annual leave during that year will be assessed on a pro rata basis, rounded up to the nearest half a day.

3.4. On termination of your employment you will receive pay in lieu of accrued and outstanding holiday entitlement. In the event that on termination of your employment the holiday taken exceeds your holiday entitlement, the Employer shall have the right to deduct from any money owing to your at the time of your leaving a sum equivalent to the number of days of unearned leave taken multiplied by the Daily Rate.

3.5. If either you or the Employer gives notice to terminate the employment you may be compelled by the Captain or the Employer to utilize any unused holiday entitlement during the applicable termination notice period.

3.6. You shall give written notice in advance to the Captain for your preferred holiday dates, who should inform the Employer and the Yacht Manager. Holiday dates will be agreed in accordance with the Yacht's expected operational schedule and must be taken during 'off season' dates as much as possible. Suitable alternative dates may be discussed with you. The Employer may occasionally require you to utilize some or all of your holiday entitlement at a time that suits the Yacht's operational circumstances. In the event that you do not submit a reasonable holiday request and do not co-operate with attempts to agree suitable holiday dates, the Captain and the Employer, reserve the right to impose holiday dates to ensure that your holiday entitlement is fully utilized if reasonably practicable.

3.7. Holiday leave is accrued but is not normally granted in any probationary period up to a maximum time of three months from the date of commencement of your employment. Holiday leave is not normally granted until it has been earned. You may, with the prior written agreement of the Employer, take holiday in excess of that which you have earned up to the time of taking the holiday and such excess shall be deducted from future holiday entitlement earned.

3.8. You must endeavor to fully utilize your holiday entitlement within each year of service. Unused holiday entitlement will not carry forward into the next year of service unless approved by the Employer in writing.

3.9. Your leave entitlement should be scheduled and utilized in not more than two periods of consecutive days, unless otherwise approved by the Employer.

3.10. For the purpose of taking annual leave, the Employer will provide after 11 month's continuous employment, one economy class return ticket during a period of twelve months to the Agreed Repatriation Destination or such other place as shall be mutually agreed. For the avoidance of doubt, you acknowledge that you will have no pro-rata entitlement in respect of any incomplete year.

3.11. You will always be entitled to repatriation to the Agreed Repatriation Destination whenever the Employer requires you to take part of your accrued leave for unforeseen operational reasons. You cannot be forced to take accrued annual leave in any different location than the repatriation destination, unless mutually agreed and allowed by local customs and immigration.

4. **Agency**

The Employer appoints the Yacht Manager to act as its agent in all matters relating to this Employment Agreement.

5. **Warranties**

5.1. Each party to this Employment Agreement warrants that they have obtained all requisite authority and permissions to enter into this Employment Agreement.

5.2. The Employee warrants that the Employee has not been charged with or convicted of any criminal offence (other than an offence under road traffic legislation in the Cayman Islands or elsewhere for which a non-custodial sentence is imposed).

6. **Miscellaneous**

6.1. The terms of your employment are governed by this Employment Agreement and the General Terms and Conditions. If there is any inconsistency between this Employment Agreement and the General Terms and Conditions, the terms of this Employment Agreement will prevail.

6.2. If there is any inconsistency between the terms of this Employment Agreement (which incorporates the General Terms and Conditions) and the Maritime Labour Convention 2006 ("**MLC**"), the terms of the MLC shall prevail. In addition, if the MLC requires any term(s) to be included in the Employment Agreement and such term(s) is/are not so included, then such term(s) shall be deemed to be included in the Employment Agreement.

6.3. No failure or delay by either party in exercising any remedy, right, power or privilege under or in relation to this Employment Agreement and/or the General Terms and Conditions shall operate as a waiver of the same nor shall any single or partial exercise of any remedy, right, power or privilege preclude any further exercise of the same or exercise of any other remedy, right, power or privilege.

6.4. Any notice given or required to be given in connection with this Employment Agreement shall be in writing. Notices may be given by either party by personal delivery or post (with a copy to be sent by email) addressed to the other party at (in the case of the Employer) its registered office for the time being or (in the case of the Employee) the Employee's last known address. Any such notice given by letter shall be deemed to have been served at the time at which the notice was delivered personally or (if sent by post) on the third business day after posting.

6.5. The parties hereto acknowledge that each has read this Employment Agreement and the General Terms and Conditions, understands both documents and agrees to be bound by the terms. The parties further agree that this Employment Agreement and the General Terms and Conditions shall together constitute the complete and exclusive statement of the agreement between the parties and supersedes all proposals, understandings, representations, conditions, covenants, and all other communications between the parties (oral or written) relating to the subject matter hereof.



6.6. No variation of this Employment Agreement and/or the General Terms and Conditions or any of the documents referred to in them shall be valid unless it is in writing and signed by or on behalf of each of the parties.

6.7. This Employment Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, and all the counterparts together shall constitute one and the same instrument.

6.8. If any provision of this Employment Agreement and/or the General Terms and Conditions shall be, or become, void or unenforceable for any reason within any jurisdiction, this shall affect neither the validity of that provision within any other jurisdiction nor any of the remaining provisions of this Agreement.

6.9. This Employment Agreement and all matters (including, without limitation, any contractual or non-contractual obligation) arising from or connected with it are governed by, and will be construed in accordance with, the laws of the Cayman Islands. The parties submit to the exclusive jurisdiction of the courts of Cayman Islands.

**Signatures:**

| Employer | Employee |
|---|---|
| I confirm that the Employee has been informed of their rights and duties under this Employment Agreement (and the General Terms and Conditions) prior to or in the process of the Employee's engagement onto the Yacht. | I confirm that I have freely entered this Employment Agreement (which incorporates the General Terms and Conditions) with a sufficient understanding of my rights and responsibilities, and I have been given an opportunity to review and seek advice on the Employment Agreement before signing. |
| | I accept and agree to abide by the General Yacht Terms & Conditions of my employment as detailed in the Employment Agreement and that this SEA replaces any previous agreements. |
| Signature: *[signature]* | Signature: *[signature]* |
| Signed on behalf of the Employer by: PIERRE FRANCEWA | Byron Chemaly |
| Date & place where this Employment Agreement is entered into : | |
| Date: 11/12/2018 | Date: 11/12/2018 |
| Place: MIAMI, USA | Place: Miami |

**Schedule B – General Terms of Employment**

The Agreement is made between the Employer and the Seafarer.

This Schedule B shall, together with Schedule A, comprise the Agreement.

The Employer reserves the right to make reasonable changes to the Seafarer's terms and conditions of employment and will notify the Seafarer in writing of such changes.

All defined terms when used in this Schedule B shall, unless otherwise defined herein, have the meanings ascribed to them in Schedule A.



The parties to the Agreement mutually agree as follows:

**1.  Probationary Period**

1.1  The Probationary Period is as detailed in Schedule A.

1.2  During the Probationary Period, both the Seafarer and the Employer shall be entitled to terminate this Agreement in writing for any reason whatsoever by giving not less than 7 days' notice to the other party, and 15 days' notice thereafter unless a shorter notice period is mutually agreed in writing.

**2.  Duties of the Employer**

2.1  The Employer agrees to faithfully comply with the terms and conditions stipulated by the Agreement and imposed by law, to pay the agreed Salary and to settle valid claims of the Seafarer in a timely manner.

2.2  The Employer agrees to make and pay for all the necessary travel arrangements (having regard to the most economically appropriate and expeditious means in the prevailing circumstances) for the Seafarer's joining and repatriation to the destination listed at Schedule A (Place of Repatriation) or any other destination mutually agreed upon by the Seafarer, Master, Employer and the Owner.

**3.  Duties of the Seafarer**

3.1  The Seafarer agrees to render with the utmost care and due diligence all duties and responsibilities expected for his/her Position as provided by the Agreement, the applicable laws and regulations, both locally (Flag State) and internationally, and shall perform all the duties requisite and necessary for the safe and lawful operation of the Yacht. The Seafarer shall faithfully serve and comply with all lawful instructions or orders, written or oral, of the Master, Employer, Owner and/or the Yacht's appointed Managers in his/her designated capacity, and to the best of his/her abilities.

3.2  In the event of an emergency, or in order to save life and/or property at sea, the Seafarer agrees to readily render assistance upon instruction of the Master.

3.3  The Seafarer shall report to the Master or such other person or persons as the Employer may nominate from time to time. Unless provided for otherwise the Master has full authority on board concerning maritime and navigational matters, the management, engagement and discharge of crew and all other matters relating to the operation of the Yacht and conduct of the crew.

3.4  The Seafarer will at all times keep his/her quarters clean and tidy and take all appropriate steps to preserve in good condition the equipment of the Yacht and all property on board, being responsible in particular for the return of all clothing and other effects in good condition, fair wear and tear excepted, on termination of the Seafarer's employment.

**4.  Seafarer**

4.1  The Seafarer accepts and acknowledges that the contractual relationship between the Seafarer and the Employer is founded on trust and the utmost good faith. The Seafarer undertakes that he/she shall not at any time during and after his/her employment with the Employer disclose to any person or use for any purposes unconnected with the Seafarer's employment with the Employer any information or photographs and other images of a confidential, private or personal nature regarding the Yacht, its itinerary and location, the Employer, the Owner of the Yacht, the Yacht's guests, charterers and passengers, and/or any information concerning the organisation, business affairs, finances or transactions of the Yacht, the Employer, the Owner and/or concerning persons with whom the Employer and/or Owner of the Yacht has dealings, whether or not the same shall be common knowledge amongst the Seafarer's fellow crewmembers and/or any others save for when the Seafarer is legally compelled or obligated to do so. This Clause 4.1 shall not apply to information that is legitimately in the public domain.

4.2  Upon termination of his/her employment with the Employer for whatever reason the Seafarer shall forthwith return to the Employer all correspondence, customer lists, drawings, photographs and other images, documents and other papers, magnetic discs, tapes or other software storage media and all other property belonging to the Employer which may be in the Seafarer's possession or under his/her control, including any copies thereof, and no such material or copies thereof shall be retained by the Seafarer without the written consent of the Employer. If so requested by the Employer the Seafarer will sign a statement confirming that he/she has complied with this requirement.

4.3     Any unauthorised disclosure by the Seafarer to a third party of any confidential information of whatever nature in breach of the Agreement will render the Seafarer liable to civil proceedings including injunction, restraining orders and liability for damages.

4.4     Whilst on board the Yacht or at any time when carrying out duties under the Agreement, the Seafarer must not use any form of electronic information system, including but not limited to any form of social networking, to:
-       send abusive, offensive, obscene, pornographic, discriminatory, racist, harassing, derogatory or defamatory e-mails or other electronic communication;
-       access any web page or any files (whether documents, images or other) downloaded from the internet which could in any way be regarded as illegal, offensive, obscene, pornographic, in bad taste or immoral; and/or
-       divulge any confidential information.

4.5     The provisions of Clauses 4.1 to 4.3 (inclusive) above shall survive the performance or termination of the Agreement without limit in time.

4.6     Failure to adhere to the above may constitute grounds for summary dismissal and for cause without notice /or specific remedy.

4.7     The Seafarer shall protect the property entrusted to him from all damage and shall safeguard the interests of the Master, Employer, Owner or the Yacht's appointed Managers in good faith. The Seafarer shall be under the express duty to take no measures which may invalidate the Yacht's insurances. The Seafarer shall not, within the term of this Agreement, accept any other employment whether paid or unpaid without the Master's, Employer's, and/or Owner's or the Yacht's appointed Managers' approval nor in any way interfere with or profit from any contracts or business arrangements between the Employer and third parties, or the Owner and third parties. Any commission, gratuities, monies or other benefits of a similar nature in respect of supplies, repair or other work and services relating to the Yacht are rightfully the property of the Owner, unless otherwise agreed in writing on a case by case basis. Any commission, gratuities, monies or other benefits of a similar nature received by the Seafarer is to be recorded and this information passed on to the Master, Owner and/or the Yacht's appointed Managers, except for normal tips from guests aboard the Yacht.

4.8     All damage of whatsoever nature to the Yacht or her equipment must be reported to the Master within 24 hours of the damage occurring or being discovered.

4.9     If so requested by the Master, Employer and/or the Owner, the Seafarer shall order fuel, stores equipment or any other necessaries according to a yearly budget he/she prepares and submits to the Master, Employer, Owner and/or the Yacht's appointed Managers. No Seafarer shall agree to expenditure outside of the budgets without the express permission of the Master, Employer, Owner and/or Managers.

4.10    The Seafarer shall, unless prevented by ill-health from doing so, devote such of his/her time and attention as required for the conscientious and efficient discharge of his/her duties as Seafarer of the Yacht.

## 5.    Pre-Employment

5.1     Unless expressly agreed with by the Master or the Employer, it is a condition of the Seafarer's employment with the Employer that he or she is in possession of all necessary valid certificates, medical and professional, and the applicable travel visas before joining the Yacht. Initial and continued employment with the Employer is subject to the Seafarer's possession of a valid marine medical fitness certificate (such as an ENG1/ILO73) demonstrating that he or she meets the appropriate statutory medical standards for the time being in force, and any failure to meet these standards during the course of the Seafarer's employment will entitle the Employer to terminate his or her employment in accordance with Clause 18 below.

## 6.    Period of Employment

6.1     The period of employment pursuant to the Agreement will commence (or will, where the context requires, be deemed to commence) on the Date of Commencement of Continuous Employment without time limit and until such time as the Agreement is terminated by either party in accordance with its terms. The Date of Commencement of Continuous Employment will be the relevant date for the purpose of calculating the Seafarer's statutory and contractual entitlements where relevant.

6.2     In the event that the Agreement is terminated by either party in accordance with its terms the period of employment will cease after the Seafarer's repatriation from the Yacht to the Place of Repatriation listed in Schedule A, or at any other place and time mutually agreed upon by the Seafarer, Master, Employer, Owner and/or the Yacht's appointed Managers, and subject to other provisions in the Agreement. In the event



that the Seafarer refuses repatriation, the Agreement will be deemed to have terminated on expiry of the period of notice given by the party terminating the Agreement in accordance with its terms. Where the Yacht is at sea on the date of expiry of the Agreement, the Agreement will continue in force until the Yacht's arrival at the next port.

6.4    Upon request, and upon termination of the Agreement, the Seafarer will be provided with a document containing a record of their employment on board the Yacht.

## 7.    Paid Annual Leave

7.1    The Seafarer shall be entitled to paid leave (normal basic remuneration) as detailed on Schedule A of the Agreement (being a minimum of [42] calendar days in each complete year of employment calculated from the Date of Commencement of Continuous Employment ("Leave Year")) which includes public holidays in the Flag State); to be taken at such time or times as may be approved by the Master, Employer, Owner and/or the Yacht's appointed Managers. No leave may be taken until it has accrued, unless agreed in writing by the Master or the Employer

7.2    Leave must be taken at times consistent with the smooth running of the Yacht. The authorisation of leave shall be at the Employer's sole discretion taking into account the Employer's and the Yacht's operational requirements. If the Employer refuses the Seafarer's request to take leave on his or her proposed dates, the Employer shall use reasonable endeavours to attempt to agree mutually agreeable alternative dates.

7.3    If the Seafarer's employment commenced or terminates part way through the Leave Year, his/her entitlement to paid Annual Leave during that year will be assessed on a pro rata basis. Deductions from the Seafarer's final Salary due to him/her on termination of employment will be made in respect of any paid Annual Leave taken in excess of his/her entitlement. The Seafarer will be entitled to payment in lieu of paid Annual Leave accrued but untaken as at the date of termination of employment.

7.4    There is no provision for the carry over of paid Annual Leave from one Leave Year to the next. All paid Annual Leave must be taken in the Leave Year in which it accrues. The Seafarer will make every effort to take his/her entitlement to paid Annual Leave in full in the Leave Year in which it accrues. However, if at the end of such Leave Year there remains any untaken Annual Leave in circumstances where the Seafarer has demonstrated to the Employer's reasonable satisfaction having been prevented from taking the full Annual Leave entitlement because of sickness, injury, or exigencies of the service of the Yacht, the Seafarer will, subject to the Employer's and the Master's approval in writing, receive payment in lieu of any such accrued, but unused, Annual Leave in the Leave Year in question calculated in accordance with Clause 1.6 of Schedule A.

7.5    The Employer reserves the right to require the Seafarer to take any unused Annual Leave entitlement during any notice period or at any other time and for such duration as the Employer may decide and will give the Seafarer reasonable (having regard to the circumstances) notice of any such requirement.

7.6    The Employer will fund for each completed year of employment travel expenses for one (1) return economy flight from the Yacht to the Place of Repatriation and ancillary ground transportation travel costs associated with the Seafarer's leave arrangements for the purpose of taking his/her Annual Leave entitlement ("the Flight Allowance"). Travel to a destination other than the Place of Repatriation may be considered at the discretion of the Employer and the Owner. The Flight Allowance will be paid directly by the Employer or, if so agreed between the parties from time to time, paid for by the Seafarer and reimbursed by the Employer together with the Seafarer's Salary following submission of a valid claim (supported by receipts or other evidence acceptable to the Employer and the Owner) for the Flight Allowance to the Master.

7.7    The Seafarer shall not be entitled to the Flight Allowance if the Seafarer is working under notice of termination, howsoever given, at the time at which the Flight Allowance would be due to be paid.

## 8.    Wages and Account of Wages

8.1    The Seafarer agrees to receive the monthly Salary as stipulated in Schedule A. Salary is calculated on a 30-day basis. Whilst serving on board the Yacht the Seafarer may request the Employer to remit a fixed monthly allotment in accordance with the Employer's company policy into a designated bank account. Such allotments will be paid monthly after the end of each working month. Payments will be made without deduction save as permitted by law and/or the Agreement.

8.2    In the event that the Seafarer receives a cash advance on board (which may be made at the Employer's sole discretion), the Employer is entitled to deduct any such sums from the Seafarer's Salary. Such advances shall not exceed the amount of Salary balance accrued at the date of request, at the rate of exchange



(where applicable and where different from the Salary currency) as stipulated by the Employer from time to time.

8.3   The Seafarer will be provided with a monthly account of all payments due to him/her and the amounts paid, including Salary, additional payments, permitted statutory deductions and the rate of exchange used where payment has been made in a currency which is different from that agreed in Schedule A.

8.4   Where the Employer proposes to reduce the Salary the Employer shall inform the Seafarer of this fact in writing, stating the reasons for the reduction, and provide notice of the proposed reduction at least equal to the Notice Period.

8.5   To the fullest extent permitted by law, the Employer reserves the right to deduct from the Seafarer's Salary or any other payments due to him/her any sums which the Seafarer may owe the Employer and/or the Owner including but not limited to any overpayments or loans made by the Employer to the Seafarer or any amount in respect of goods or services supplied to or used by the Seafarer.

## 9. Hours of Work and Rest

9.1   The Seafarer's hours of work will be arranged such as to ensure that he/she receives a minimum of 10 hours available for rest in each 24-hour period and a minimum of 77 hours rest in each seven-day period.

9.2   The hours of rest may be divided into no more than two periods, one of which shall be at least six hours in length, and the interval between consecutive periods of rest shall not exceed 14 hours.

9.3   Flag State regulations require the Master or a person authorised by the Master to maintain a record of the Seafarer's daily hours of rest. The records should be kept in English and the working language of the Yacht if that is not English.

9.4   The records of the Seafarer's hours of rest are required to be endorsed by the Master or a person authorised by the Master, and by the Seafarer, and a copy of the record as endorsed will be presented to them.

9.5   The Seafarer may be required, at the absolute discretion of the Master, to work additional hours during an emergency affecting the safety of the Yacht, its passengers, crew or cargo or the marine environment or to give assistance to other ships or persons in peril. The Seafarer may also be required to work additional hours for safety drills such as musters, fire-fighting and lifeboat drills. In such circumstances the Seafarer will be provided subsequently with an adequate period of compensatory rest.

## 10. Insurance Details

10.1   During the term of this Agreement, the Seafarer will be entitled to membership of the medical expenses and personal accident insurance scheme procured by the Employer (and/or the Owner) for the benefit of Seafarers working on board the Yacht. Details of such scheme, and of any other relevant insurances pertaining to the Yacht in place from time to time and mandatory under the laws of the Flag State, will be provided to the Seafarer on request. Should the Seafarer wish to obtain additional cover over and above that provided by the Employer (and/or the Owner), the cost thereof shall be for the Seafarer's account.

10.2   During the period of employment the Seafarer shall if he/she becomes incapacitated as a result of occupational illness, sickness or injury be entitled, if required, to medical attention at the Employer's (and/or the Owner's, where the context requires) discretion and expense, and the supply of necessary medicines and therapeutic devices and board and lodging away from home until his/her recovery or until his/her sickness or incapacity has been declared of a permanent character, subject to a maximum period of 112 days (16 weeks) from the day of injury or the commencement of the sickness or illness. For this purpose, the Manager and/or Employer shall (or procure that the Owner does) make arrangements to ensure there is appropriate insurance in place in accordance with Clause 10.1 to cover the Employer and the Owner fully against any legal claim the Seafarer may have by reason of injury, illness, sickness or death and against possible contingencies arising from the Agreement.

10.3   The Seafarer agrees to participate in any medical screening procedures that the Manager, Employer and/or the Owner shall choose, regardless of whether such screening is random or scheduled.

10.4   The Seafarer is, under normal circumstances, to be in possession of a valid medical certificate. In the event that a medical certificate expires during the course of employment under the Agreement the Manager, Employer and/or the Owner are to be notified immediately.

## 11. Health Benefits



11.1 The Seafarer will if he/she becomes incapacitated as a result of occupational illness, sickness or injury be provided with any medical care on-board should that become necessary, free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise. Where practicable and appropriate, the Seafarer will be given leave to visit a qualified medical doctor or dentist in ports of call for the purpose of obtaining treatment.

11.2 If the Seafarer knowingly and intentionally conceals and/or does not disclose past medical conditions, disability and history of pre-employment medical examinations, this may constitute fraudulent misrepresentation, shall disqualify him/her from any compensation or benefits, and may result in summary dismissal.

11.3 If the Seafarer is on a voyage at the time they become sick or injured, hospitalised or declared unfit for work the Seafarer will be paid their normal basic Salary as stated or calculated within the Agreement, as sick pay, up to a maximum of 112 days (16 weeks) or until recovery of health (whichever shall be the earlier). In the event of repatriation in accordance with Clause 16 below, the Seafarer will continue to be paid his/her normal basic Salary up to a maximum of 112 days (16 weeks) from becoming sick or injured, hospitalised or declared unfit for work or until recovery (whichever shall be the earlier). After repatriation, sick pay will be less the amount of any statutory sick pay or social security benefits to which the Seafarer may be entitled.

11.4 The Seafarer is only entitled to continue receiving sick pay, as a result of occupational injury or illness, if he/she submits himself/herself to a post-employment medical examination, if so reasonably requested by the Employer and/or the Owner, by a doctor within three (3) working days of his/her return to his/her Repatriation Destination.

11.5 In order for the Seafarer to continue receiving sick pay payments he/she must present himself/herself for further medical examinations, as reasonably required and as instructed by the Employer's and/or Owner's designated doctor or at least once a month, and must provide evidence that he/she is still incapacitated and unable to work.

11.6 The Seafarer's entitlement to any benefits afforded under this Agreement, including but not limited to personal accident cover and/or health insurance, may be forfeited in the event of the Employee's gross misconduct.

12. **Compensation in case of Permanent Disability**

12.1 If the Seafarer suffers injury due to an accident whilst on board or suffers an occupational illness through no fault of his/her own, including accidents and illnesses occurring whilst travelling to or from the Yacht at the request of the Employer or as a result of marine peril, and his/her ability to work is permanently reduced as a result thereof, he/she shall be entitled to receive compensation according, and subject, to the Yacht's insurances referred to in Clause 10.1 and any applicable compensation levels set out therein.

12.2 A doctor appointed by the Employer and/or the Owner shall determine the extent of disability suffered by the Seafarer. If a doctor appointed by the Seafarer disagrees with the assessment of a doctor appointed by the Employer and/or the Owner, a third doctor may be nominated jointly between the parties, and the decision of this doctor shall be final and binding.

12.3 No compensation shall be due or payable in respect of any injury, incapacity or disability of the Seafarer resulting from his/her wilful or criminal act or intentional breach of his/her duties, injury, incapacity or disability incurred otherwise than in the service of the Yacht, or sickness or infirmity intentionally concealed when the Agreement is entered into.

12.4 In the event that the Seafarer is entitled to total permanent or partial permanent disability benefit payment, the Employer is entitled to offset this payment against any legal liabilities which it might subsequently owe to the Seafarer.

13. **Compensation in case of Death**

13.1 In case of death of the Seafarer whilst on board the Yacht, the Employer shall be responsible for payment of death compensation as stipulated in, and subject to, the Yacht's insurances referred to in Clause 10.1 to the Seafarer's Beneficiary.

13.2 Any compensation shall to the fullest extent permitted by law be in full and final settlement of all claims / demands of whatsoever nature, howsoever and wheresoever arising, which the Seafarer's Beneficiary



has or may have thereafter, whether arising in tort, contract, statutory law or any other basis of recovery, on account of death suffered by the deceased.

13.3    Further liabilities of the Employer if the Seafarer dies as a result of injury or illness whilst on board the Yacht are as follows:

- The Employer shall pay the Seafarer's Beneficiary all outstanding sums accrued and due to the Seafarer under the Agreement.

- The Employer shall arrange transport of the remains and personal effects of the Seafarer to his/her Repatriation Destination at the Employer's expense.

- The Employer will also meet the reasonable cost of burial expenses.

13.4    No compensation shall be due or payable pursuant to this Agreement in respect of the death of the Seafarer resulting from his/her wilful act or omission, or any criminal act or intentional breach of his/her duties, including suicide, or otherwise than in the service of the Yacht.

13.5    In the event of the Seafarer's death, any payment due under the Employer's insurance policy shall be paid to the Seafarer's Beneficiary, as detailed in Schedule A of this Agreement. If the Seafarer has not nominated a beneficiary, the aforementioned benefits shall be paid to the person or body empowered by law or otherwise to administer the Seafarer's estate.

14.    **Drugs & Alcohol**

14.1    At no time whilst on duty or at sea will the Seafarer consume, nor will the Seafarer be under the influence of, alcohol. During the Seafarer's employment the Seafarer will not at any time intake or consume unprescribed drugs (other than over the counter medication approved by a registered medical practitioner in accordance with the terms of this Clause 14.1) or illegal substances of any kind. The Seafarer will not without the prior approval of the Master consume any prescription or other over the counter medicines to the extent that such drugs may affect his/her ability to perform his/her employment duties.

14.2    The Manager, Employer and the Owner each have a zero tolerance to drug and alcohol abuse. The Seafarer hereby confirms to participate in drug and alcohol testing when requested by the Employer, Master, Owner or port state authorities. These may be on a random basis or in response to a specific set of circumstances.

14.3    The Seafarer hereby also confirms to agree to a search being held in his/her cabin or among his/her personal effects when required by the Master, Employer, Owner or the Yacht's appointed Managers and/or port state authorities.

14.4    Possession and /or use of unauthorised drugs and alcohol are not permitted at any time on board of the Yacht.

15.    **Smoking**

15.1    The Employer operates a zero-tolerance no-smoking policy on board the Yacht at all times whether the Seafarer is on or off duty.

16.    **Repatriation**

16.1    The Seafarer will be entitled to repatriation, at the expense of the Employer, to his/her Repatriation Destination as listed on Schedule A when the Agreement is terminated under the following circumstances:

(a)    the Agreement expires when they are anywhere other than their Repatriation Destination;
(b)    the Notice Period required to be given to terminate the Agreement by the Employer or by the Seafarer expires;
(c)    the Seafarer terminates the Agreement because they are no longer able to carry out their duties under the Agreement or cannot be expected to carry them out in the following circumstances:

- in the event of illness or injury or other medical condition which requires their repatriation when found medically fit to travel;
- in the event of shipwreck;

- in the event of the Employer not being able to continue to fulfil their legal or contractual obligations including, without limitation, by reason of insolvency or sale of the Yacht;
- in the event of a ship being bound for a war zone as defined by the Flag State, to which the Seafarer does not consent to go;
- in the event of termination or interruption of employment in accordance with an industrial award or collective agreement; and
- compassionate or other urgent reasons.

16.2    If the Seafarer's presence at home is required on account of serious illness, death or similar circumstances of next of kin, the Employer will make every effort to arrange emergency relief as soon as possible, subject to mutual agreement. In such an event, repatriation shall be provided by the Employer at the Employer's sole discretion.

16.3    If the Seafarer delays or desires a detour and / or other destination other than the most direct to the Repatriation Destination, all additional expenses shall be borne by the Seafarer. Unless otherwise expressly agreed by the Employer in writing, all deviation shall be taken at the Seafarer's own risk and responsibility and neither the Employer nor the Owner shall be liable for any costs or expenses whatsoever incurred as a result of such deviation. In such an event, and unless otherwise expressly agreed by the Employer in writing as aforesaid, neither the Employer nor the Owner shall be liable to pay compensation for any accident, illness or death caused while on deviation howsoever caused or arisen.

16.4    The entitlement to repatriation entails:

- economy class transport by air or rail to Repatriation Destination as listed in Schedule A.
- accommodation and food from the moment the Seafarer leaves the Yacht until they reach the Repatriation Destination;
- payment of Salary (pro rata) from the moment the Seafarer leaves the Yacht until they reach the Repatriation Destination (save in circumstances where repatriation is refused, as set out in Clause 6.2);
- sufficient money to meet minor ancillary costs likely to be incurred by the Seafarer for their relief and maintenance from the moment they leave the Yacht until they reach the Repatriation Destination;
- transportation of up to 30kg of the Seafarer's personal luggage to the Repatriation Destination; and
- medical treatment when necessary until the Seafarer is medically fit to travel to the Repatriation Destination.

16.5    The Flag State regulations on repatriation shall be made available to the Seafarer on board the Yacht on request. The maximum period of service on board following which the Seafarer is entitled to repatriation will always be less than 12 months.

17.     **Disciplinary Rules and Procedure**

17.1    The disciplinary rules applicable to the Seafarer are set out in the current Code of Conduct for the Merchant Navy ("Code of Conduct") which the Seafarer must familiarise himself/herself with.

17.2    The Code of Conduct will be made available to the Seafarer, if so requested, before he/she signs the Agreement. A copy of the Code of Conduct will also be made available on board the Yacht on request.

17.3    If the Seafarer is dissatisfied with any disciplinary decision taken in relation to him/her, he/she should refer to the non-contractual disciplinary procedure set out in the Code of Conduct.

17.4    The Employer may immediately on commencing any disciplinary investigation without notice suspend the Seafarer on full pay and/or exclude the Seafarer from the Yacht and all premises of the Employer and/or Owner until completion of such disciplinary investigation. The Seafarer may be accompanied by a fellow seafarer of the Seafarer's choice at all stages of the non-contractual disciplinary procedure.

17.5    The Master on board is entitled by his/her capacity to act on behalf of the Employer, Owner (or the Yacht's appointed Managers) for disciplinary procedures relating to the Seafarer.

18.     **Termination of Employment**

18.1    Either party may terminate the Agreement by giving the Notice Period in writing to the other party as identified in Schedule A, unless the Agreement is terminated for justified reasons in advance. Notice

of termination can also to be given verbally before a witness. Where possible this should also be recorded in the notice of termination letter. If this is not possible, this is to be recorded in the Yacht's official log book.

18.2   The Seafarer may terminate his/her employment with a shorter notice period, or without notice, with the Employer's agreement or when the Employer can no longer meet its obligations under the Agreement.

18.3   If the Seafarer needs to terminate the Agreement for compassionate or other urgent reasons, this shall be without penalty to the Seafarer.

18.4   Termination shall have effect after the Notice of Termination Period has lapsed, although the Seafarer is (subject to Clause 6.2) entitled to his/her Salary (or payment in lieu thereof) until he/she has arrived in their Repatriation Destination.

18.5   The Employer may terminate the Agreement with immediate effect in writing, and without prior notice, in the event that the Seafarer commits gross misconduct. Gross misconduct includes (but is not limited to) the following:

- assault;
- wilful damage to Yacht or any property on board;
- theft or possession of stolen property;
- possession of offensive weapons;
- persistent or wilful failure to perform duty;
- unlawful possession or distribution of drugs;
- conduct endangering the Yacht, persons on board, or the marine environment;
- combination with others at sea to impede the progress of the voyage or navigation of the Yacht;
- disobedience of orders relating to safety of the Yacht or any person on board, or any other lawful order;
- sleeping on duty or failure to remain on duty, if such conduct would prejudice the safety of the Yacht or any person on board or the marine environment;
- incapacity through the influence of drink or drugs to carry out duty to the prejudice of the safety of the Yacht or of any person on board or the marine environment;
- smoking, using a naked light or an unapproved electric torch in any part of a Yacht carrying dangerous cargo or stores where smoking or the use of naked lights or unapproved torches is prohibited;
- failure to report to work without satisfactory reason or absence from place of duty or from the Yacht without leave;
- interference with the work of others;
- intimidation, coercion and/or interference with the work of other employees;
- behaviour which seriously detracts from the safe and/or efficient working of the Yacht;
- conduct of a sexual nature, or other conduct based on sex affecting the dignity of women and men at work which is unwanted, unreasonable and offensive to the recipient;
- behaviour which seriously detracts from the social well-being of any other person on board including, but not limited to, bullying, harassment, intimidation and coercion;
- causing or permitting unauthorised persons to be on board the Yacht whilst it is in port or at sea;
- demanding and/or receiving any commission or any other favour or benefit from any passenger, guest, customer or supplier (excluding only unsolicited tips given by guests or passengers for service provided and/or as otherwise permitted under the Employer's and/or Owner's rules from time to time and/or as expressly provided under this Agreement);
- deliberate misuse of a harbour pass or personal identity card;
- refusal to provide, on the Employer's reasonable request, evidence that the Seafarer is complying with his or her social security payment obligations in accordance with Clause 23 below;
- repeated commission of breaches of a lesser degree listed below ((i) – (vi)) after warnings have been given in accordance with the procedures outlined in the Code of Conduct for the Merchant Navy:

    (i)    offences of the kind described above (a - u), which are not considered to justify dismissal in the particular circumstances of the case;
    (ii)   minor acts of negligence, neglect of duty, disobedience and assault;
    (iii)  unsatisfactory work performance;
    (iv)   poor time keeping;
    (v)    stopping work before the authorised time;
    (vi)   offensive or disorderly behaviour.

18.7   Any such termination shall have effect from the date on which the termination notice is issued.

18.8  Without prejudice to the Seafarer's entitlement(s) pursuant to Clauses 10 – 12 (as applicable), the Agreement shall also be deemed terminated in the event that the Seafarer is repatriated for medical reasons which render him/her unfit for duty, in which event the effective date on which the Agreement shall have been terminated will be the date on which the Seafarer is repatriated following discharge from the Yacht due to such medical reasons.

18.9  Without prejudice to the terms and conditions above, the Agreement shall be deemed terminated by the Seafarer with the consequences provided above if he/she is absent from his/her work place or duties unless such absence is known and approved by the Master, Employer, Owner and/or the Yacht's appointed Managers.

18.10  On termination of the Agreement all remuneration accrued and due to the Seafarer will be paid without undue delay. This includes any accrued and untaken Annual Leave. The Employer may at its sole discretion determine whether the Seafarer will work any applicable Notice Period or whether to pay the Seafarer Salary in lieu of notice. Where the Seafarer is required to work part of the Notice Period only, the Seafarer will be paid in lieu of the remainder of the Notice Period. Once notice of termination is given by either party the Employer may suspend the Seafarer from work for part or all of the Seafarer's Notice Period. The Employer shall be under no obligation to provide the Seafarer with work during that time. If either the Employee or the Employer give notice to terminate the employment, the Employee may be compelled by the Employer to utilize any unused holiday entitlement during the applicable termination notice period.

18.11  Nothing in the Agreement shall preclude the parties from agreeing in writing to terminate the Agreement without notice.

18.12  Should the Seafarer walk off the Yacht without serving their required notice period, the Employer shall be entitled to recover from the Seafarer the costs of repatriation up to any maximum prescribed by the Flag State.

## 19. Seafarer's Complaint Procedure

19.1  If a Seafarer has a complaint regarding their employment then he/she should follow the Yacht's on board "Seafarer's Complaint Procedure". The procedure will be made available to the Seafarer, if so requested, before he/she signs the Agreement. The "Seafarer's Complaint Procedure" will also be provided upon joining the Yacht.

## 20. Compensation for the Yacht's loss or foundering

20.1  The Employer shall (or shall procure that the Owner shall) provide financial security to assure compensation to the Seafarer in the event of the loss or foundering of the Yacht, The Agreement will terminate automatically on the date of loss or foundering of the Yacht. In such circumstances the Seafarer will be entitled to the following:

(a)  Salary for each day (as per Schedule A, calculated daily pro rata) the Seafarer remains unemployed, limited to 2 months' Salary. This is to commence on the day when the Agreement is deemed terminated as set out in this Clause 20.1.

(b)  Where the Seafarer loses personal property, as a result of the Yacht on which he/she is serving foundering or being lost, compensation as listed in Clause 22 below in relation to such personal property lost.

## 21. Luggage Allowance

21.1  The Seafarer travelling by air or sea to join a Yacht or on repatriation is entitled to transportation of up to 30kg of his/her personal luggage. The costs of any excess baggage shall be borne by the Seafarer.

## 22. Seafarer Personal Effects Cover

22.1  The Employer will put in place and maintain (or procure that the Owner puts in place and maintains) a basic level of insurance in respect of the personal belongings of the Seafarer during the term of the Agreement. Should the Seafarer wish to obtain additional cover over and above that provided by the Employer (and/or the Owner), the cost thereof shall be for the Seafarer's account. Under no circumstances shall the Employer (or the Owner) be liable for any loss or damage to the Seafarer's personal effects howsoever caused beyond the level provided for under the Employer's (and/or the Owner's) insurance as provided for under this Clause 22.

22.2 In the event of the Yacht foundering, loss or damage, the Seafarer personal effects cover is limited to a maximum aggregate sum of €15,000 (and subject to any one article valued at €10,000 or more being specifically declared by the Seafarer to the Employer in writing).

## 23. Tax / Social Security

23.1 The Seafarer is solely and entirely responsible for his/her own tax / social security /local tax obligations and must register with the relevant tax and social security authorities, and pay his/her income tax, social security and/or national insurance contributions to the applicable authorities. The Seafarer agrees to indemnify the Employer and the Owner against any and all claims for unpaid taxes, national insurance contributions, social charges and other deductions, contributions or payments which may be required by law in respect of the Seafarer's earnings under the Agreement, including all associated fees, costs, charges and legal expenses incurred by the Employer and/or the Owner.

23.2 The Seafarer shall, on the Employer's reasonable request, provide evidence to the Employer that he or she is compliant with his or her social security payment obligations. Failure to comply with this Clause may be considered grounds for summary termination in accordance with Clause 18 above.

23.3 Neither the Employer nor the Owner shall be obliged to contribute to any pension scheme statutory or otherwise in respect of the Seafarer.

## 24. Subsistence & Lodging

24.1 The Employer will provide (or procure the provision of) sufficient food of reasonable quality, nutritional value and quantity while the Seafarer is deployed on the Yacht. If the galley is not operational while the Seafarer is on board the Yacht, the Employer will, at its discretion, either provide a daily food allowance (from time to time notified by the Employer) or, at the Employer's discretion, suitable food ashore.

24.2 The Seafarer is entitled to suitable accommodation and sleeping quarters on board the Yacht. Where for any reason shipboard accommodation is unavailable (such as when the Yacht is undergoing repairs) the Employer will make (or procure) suitable alternative accommodation available.

## 25. Training Courses

25.1 The Employer may, in certain circumstances, request that the Seafarer undertakes training with a view to improving levels of skill and knowledge and/or if considered beneficial to the smooth and safe operation of the Yacht. If any such training is required by the Employer:

- the Employer will bear the proven cost of such training;
- any time spent by the Seafarer attending such training will count towards the Seafarer's service with the Employer and towards the Annual Leave entitlement; and
- the Seafarer will accrue Salary but not leave during such training.

25.2 The Employer may at its sole discretion, subject to the Seafarer having completed a full year of service with the Employer, authorise the Seafarer's attendance on training courses proposed by the Seafarer and/or the Master, in each case with a view to improving levels of skill and knowledge and/or if considered beneficial to the smooth and safe operation of the Yacht. Moreover, following completion of the first year of service from the Date of Commencement of Continuous Employment, and in each subsequent year of completed service, the Employer will allocate an annual study and training contribution allowance of a maximum sum of €2,500 (Euros Two Thousand Five Hundred) ("Study Allowance") to the Seafarer, such Study Allowance to be applied, and disbursed, in the manner set out in Clause 25.3 and 25.4.

25.3 If any training referred to in Clause 25.2 is requested by the Seafarer and/or the Master:

- the authorisation of any such training shall be at the sole discretion of the Employer;
- the Employer's written authorisation must be obtained in advance of booking or attendance on any such training course;
- any time spent by the Seafarer attending such training will only count towards the Seafarer's service with the Employer and towards the Annual Leave entitlement if authorised in writing by the Employer in advance;
- the Seafarer will not accrue Salary during such training unless so authorised in writing by the Employer in advance; and
- the approved costs of such training course will be paid by the Seafarer, or reimbursed to the Seafarer (subject to the Employer's approval as aforesaid, and against reasonable proof in the form of invoices and receipts), out of and subject to the maximum limit of the Study Allowance, on

the anniversary of completion of such training, provided always that the Seafarer remains employed by the Employer upon such anniversary falling due.

25.4   If the Seafarer is dismissed or serves notice of termination under this Agreement, for any reason, within twelve (12) months from completion of any training referred to in Clauses 25.2 and 25.3, the Seafarer will bear the full cost of such training and will not be entitled to any contribution from, or reimbursement by, the Employer whether out of the Study Allowance or otherwise. If any Study Allowance has already been paid to the Seafarer, this may be deducted from any further sums due to the Seafarer.

## 26. Yacht's Trading Area

26.1   The Seafarer agrees to the Yacht's lawful employment in worldwide trade. The Agreement shall be for a voyage or voyages, and/or time spent in port, and within an unlimited geographical area.

## 27. Jurisdiction

27.1   Unless otherwise stipulated the Agreement shall be governed by the laws of the Cayman Islands.

## 28. Arbitration

28.1   Should there be any dispute arising out of the Agreement, it shall be submitted for arbitration in the Cayman Islands.

## 29. Miscellaneous

29.1   Agreement shall otherwise remain in full force and effect as if such provision had not been contained therein. Notwithstanding the foregoing in the event of any such deletion the parties shall negotiate in good faith in order to agree the terms of an acceptable alternative provision.

29.2   If there is any inconsistency between the terms of this Agreement and the Maritime Labour Convention 2006 ("MLC"), the terms of the MLC shall prevail. In addition, if the MLC requires any term(s) to be included this Agreement and such terms(s) is or are not so included, then such term(s) shall be deemed to be included in the Agreement.



R. Operations Ltd
C/O Campbells Corporate Services Lt
PO Box 268 Grand Cayman
KY1 1104 Cayman Islands

Byron Chemaly
24 Soutpansberg Ext 6
White River
1240

South Africa

15 Mar 2019

### Amendment to Seafarer Employment Agreement — Fountainhead

Dear Byron

We wish to advise you that your monthly salary has been increased to ▬▬ ▬▬ with effect from 09 Mar 2019.

Please retain this letter as it now forms part of your Seafarers Employment Agreement. All other terms and conditions of your SEA will remain unchanged.

May we take this opportunity to congratulate you and wish you every success in the future.

Yours sincerely,

*[signature]*

CAPTAIN PIETER FERREIRA
For and on behalf of the Employer.

*[signature]*