## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-24257-BLOOM/Torres

BYRON CHEMALY,

      Plaintiff,

v.

EDDIE LAMPERT, *individually*;
GRANT GOLD, *individually*;
R. OPERATIONS, LTD, *a foreign entity*;
FOUNTAINHEAD MARINE LIMITED,
*a foreign entity*;
CAMPER & NICHOLSON, *a Florida*
*Corporation*; *and*
XL CATLIN SYNDICATE 2003M,
*a foreign insurer registered and*
*authorized to do business in Florida*,

      Defendants.

_____/

## <u>OMNIBUS ORDER</u>

**THIS CAUSE** is before the Court upon two separate motions: (1) Defendants' Eddie

Lampert, Grant Gold, R. Operations, Ltd., Fountainhead Marine Limited, Camper & Nicholson,

and XL Catlin Syndicate 2003M Motion to Compel Arbitration and to Dismiss, ECF No. [5]

("Motion to Compel Arbitration"), filed on November 14, 2023; Plaintiff filed a Response in

Opposition, ECF No. [25], to which Defendants filed a Reply, ECF No. [30]; and (2) Plaintiff's

Motion to Remand the Case to State Court, ECF No. [10] ("Motion to Remand"), filed on

December 7, 2023; Defendants filed a Response in Opposition, ECF No. [20], to which Plaintiff

filed a Reply, ECF No. [26]. The Court has carefully reviewed the Motions, all related submissions,

the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth

below, the Motion to Compel Arbitration, ECF No. [5], is granted in part and denied in part. The

Motion to Remand, ECF No. [10], is granted in part and denied in part.

## I.   BACKGROUND

Plaintiff Byron Chemaly ("Plaintiff") brought this case in the Eleventh Judicial Circuit in

and for Miami-Dade County, on August 1, 2023. Plaintiff seeks money damages, pursuant to

incidents that occurred while employed as a seaman aboard the yacht M/Y FOUNTAINHEAD

("Yacht"). Plaintiff's Complaint contains seven counts:

| | |
|---|---|
| Count 1: | Jones Act negligence against R. Operations, Fountainhead Marine Limited, and Lampert; |
| Count 2: | Unseaworthiness against R. Operations, Fountainhead Marine Limited, and Lampert; |
| Count 3: | Failure to provide maintenance and cure against R. Operations, Fountainhead Marine Limited, and Lampert; |
| Count 4: | Failure to treat against all Defendants; |
| Count 5: | Negligence against Camper, the Yacht's management company; |
| Count 6: | Conversion against all Defendants; |
| Count 7: | Breach of insurance contract against Camper and Catlin. |

Plaintiff alleges the following: on August 8, 2020, the Yacht was off the coast of Sag Harbor,

New York. ECF No. [1-2] at 6. Defendant Lampert's son was using a "Sea Bob," a motorized

assistance device for divers. ECF No. [1-2] at 6. Plaintiff and Captain Grant Gold ("Gold") were

tasked with recovering the Sea Bob from the water and storing it aboard the Yacht. ECF No. [1-2]

at 6-7. The Yacht was not equipped with a mechanical device to lift the Sea Bob. ECF No. [1-2]

at 7.

While Plaintiff and Gold were lifting the Sea Bob out of water, Gold dropped his radio.

ECF No. [1-2] at 7. Gold let go of the Sea Bob to avoid it dropping into the water. ECF No. [1-2]

at 7. This shifted all the weight of the Sea Bob to Plaintiff, resulting in severe injury to his right

shoulder. ECF No. [1-2] at 7. Despite his employers' awareness of his injury, Plaintiff was told to

forego pain medication and do various duties on the Yacht, including washing the Yacht, and cleaning and repairing its teak. ECF No. [1-2] at 7. This further aggravated his injuries. ECF No. [1-2] at 7. Plaintiff was put on night shifts so Yacht guests would not see him in a sling. ECF No. [1-2] at 7. It was only when Plaintiff reached Miami-Dade County that he was able to receive medical treatment. ECF No. [1-2] at 7. From Miami, Defendants repatriated Plaintiff to South Africa, his home country. ECF No. [1-2] at 7. They did not return Plaintiff's personal effects, which were left on board the Yacht, despite his repeated demands for them. ECF No. [1-2] at 8. Plaintiff sued various Defendants associated with the incidents.

Defendants removed the case to this Court on November 7, 2023 under 9 U.S.C. § 205 as "the subject matter of the action pending in Miami-Dade County relates to an arbitration agreement or award falling under the Convention[,]" ECF No. [1] at 2. Concurrently, Defendants invoke admiralty jurisdiction under 28 U.S.C. § 1333 as the "district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." ECF No. [1] at 2. They attach to their Notice of Removal the Seafarer Employment Agreement ("SEA"), signed by Plaintiff and Defendant R. Operations for Plaintiff's permanent service on board the Yacht.

Plaintiff and R. Operations signed the SEA on November 12, 2016. ECF No. [1-1]. The SEA contains a Schedule A, the Employee Specific Terms and Conditions ("Schedule A"), and a Schedule B, the General Terms of Employment ("Schedule B"). Section 6.1 of Schedule A provides that "[i]f there is any inconsistency between this Employment Agreement ["Schedule A"] and the General Terms and Conditions ["Schedule B"], the terms of this Employment Agreement ["Schedule A"] will prevail." ECF No. [15] at 4-5.

Relevant to 9 U.S.C. § 205, Section 28.1 of Schedule B contains an arbitration clause: "Should there be any dispute arising out of the agreement, it shall be submitted for arbitration in the Cayman Islands." ECF No. [1-1] at 17.

In addition, the SEA contains various sections delineating R. Operations' duties toward its employees in case of a health issue. For instance, Section 10.2 of the SEA provides:

> During the period of employment the Seafarer shall if he/she becomes incapacitated as a result of occupational illness, sickness or injury be entitled, if required, to medical attention at the Employer's (and/or the Owner's, where the context requires) discretion and expense, and the supply of necessary medicines and therapeutic devices and board and lodging away from home until his/her recovery or until his/her sickness or incapacity has been declared of a permanent character, subject to a maximum period of 112 days (16 weeks) from the day of injury or the commencement of the sickness or illness. For this purpose, the Manager and/or Employer shall (or procure that the Owner does) make arrangements to ensure there is appropriate insurance in place in accordance with Clause 10.1 to cover the Employer and the Owner fully against any legal claim the Seafarer may have by reason of injury, illness, sickness or death and against possible contingencies arising from the Agreement.

ECF No. [5-1] at 10.2.

Section 11 details Seafarer's health benefits under the Agreement, as follows:

> 11.1. The Seafarer will if he/she becomes incapacitated as a result of occupational illness, sickness or injury be provided with any medical care on-board should that become necessary, free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise. Where practicable and appropriate, the Seafarer will be given leave to visit a qualified medical doctor or dentist in ports of call for the purpose of obtaining treatment.

ECF No. [5-1] at 11.1.

Section 11.3 further details the salary owed to a seafarer who "is on a voyage at the time they become sick or injured or declared unfit for work" or "[i]n the event of repatriation[.]" Finally, Section 11.4 lays out a medical examination requirement for sick pay. ECF No. [5-1] at 11.4. Section 12 and 13 of the SEA then cover compensation in case of permanent disability or death.

Defendants are as follows: R. Operations and Fountainhead Marine Limited are two foreign corporate entities. R. Operations is the Plaintiff's employer, with whom Plaintiff signed the SEA setting forth the terms of his employment. ECF No. [5-1] at 2. Fountainhead Marine Limited is the entity that owns the Yacht. ECF No. [1-2] at 4. Both R. Operations and Fountainhead Marine Limited are incorporated in the Cayman Islands. ECF No. [1-2] at 4. Plaintiff alleges that both companies are "artifice[s] designed to avoid United States taxes and liability" and are "alter ego[s] and/or agent[s]" of Defendant Eddie Lampert. ECF No. [1-2] at 4-5. Plaintiff alleges that the Yacht's principal place of business, home port, and base of operations is Miami, Florida. ECF No. [1-2] at 4. In an attached declaration, Defendants argue the Yacht has no home port. ECF No. [5-5] at 2.

Plaintiff also brings claims against two individual Defendants, Eddie Lampert ("Lampert") and Grant Gold ("Gold"). In his Complaint, Plaintiff alleges Lampert is the "beneficial owner of/ real party in interest to the yacht[.]" ECF No. [1-2] at 4. Gold was the captain of the Yacht at the time of Plaintiff's employment. ECF No. [5-5] at 2.

Finally, Plaintiff brings claims against two additional corporations: Defendant Camper & Nicholsons ("Camper"), which Plaintiff alleges is a Florida corporation, and Defendant XL Catlin Syndicate 2003 ("Catlin"), a foreign insurer registered and authorized to do business in Florida. ECF No. [1-2] at 5. Camper managed the Yacht's "operational, maintenance, technical and financial services, and was responsible for ensuring the yacht was adequately manned and equipped for its intended purpose, which included the deployment, use and recovery of the yacht's Sea Bob." ECF No. [1-2] at 5-6. Catlin is a foreign underwriter registered with the Florida Department of Insurance Regulation. ECF No. [1-2] at 6. Catlin is authorized to do business in Florida and insured risks associated with the ownership and/or operation of the Yacht. ECF No.

[1-2] at 6.

## II.  LEGAL STANDARD

### A.  Motion to Compel Arbitration

When a court reviews a Motion to Compel Arbitration, "a summary judgment-like standard is appropriate." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). A court "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Id.* "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986)). "This court has consistently held that conclusory allegations without specific supporting facts have no probative value" for a party resisting summary judgment. *Bazemore*, 827 F.3d at 1333.

Still, "[t]he party opposing a motion to compel arbitration or to stay litigation pending arbitration has the affirmative duty of coming forward by way of affidavit or allegation of fact to show cause why the court should not compel arbitration." *Sims v. Clarendon Nat'l Ins. Co.*, 336 F. Supp. 2d 1311, 1324 (S.D. Fla. 2004); *see also Citi Cars, Inc. v. Cox Enterprises, Inc.*, No. 1:17-CV-22190-KMM, 2018 WL 1521770, at *4 (S.D. Fla. Jan. 22, 2018). "This burden is not unlike that of a party seeking summary judgment" because "the party opposing arbitration should identify those portions of the pleadings, depositions, answers to interrogatories, and affidavits which support its contention." *Sims*, 336 F. Supp. at 1324; *Bertram v. Beneficial Consumer Discount Co.*, 286 F. Supp. 2d 453, 456 (M.D. Pa. 2003) (in the context of a motion to compel arbitration or to

stay litigation pending arbitration, "the court may consider the pleadings, documents of uncontested validity, and affidavits or depositions submitted by either party").

### B.  The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards

When confronted with an arbitration agreement that involves foreign entities, courts turn to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") to determine if the arbitration agreement is enforceable. June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3. The Convention requires courts of signatory nations, such as the United States, to give effect to private arbitration agreements and to enforce arbitral awards made in signatory nations. Convention, art. I(1); *see also Sierra v. Cruise Ships Catering & Servs. Int'l, N.V.*, 631 F. App'x 714, 715-16 (11th Cir. 2015). The United States enforces the Convention through Chapter 2 of the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 201-208. Section 205 of the FAA permits removal of a case from state to federal court before the start of trial when the dispute "relates to an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205.

Under both the FAA and the Convention "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate' it." *Doe v. Princess Cruise Lines*, Ltd., 657 F.3d 1204, 1213 n.9 (11th Cir. 2011) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, Inc., 473 U.S. 614, 626 (1985)). In other words, "the parties will not be required to arbitrate when they have not agreed to do so." *Id.* at 1214 (quoting *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1419 (11th Cir. 1990)). Beyond that threshold consideration, "[i]n deciding a motion to compel arbitration under the Convention Act, a court conducts a very limited inquiry.'" *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005) (citations omitted). A court must order arbitration if four jurisdictional prerequisites are met:

(1) there is an agreement in writing to arbitrate the dispute within the meaning of the Convention;
(2) the agreement provides for arbitration in the territory of a Convention signatory;
(3) the agreement arises out of a commercial legal relationship; and
(4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Bautista*, 396 F.3d at 1294 n. 7. Even if Jones Act claims are not generally subject to removal, "the Convention authorizes the removal to federal court of claims 'relat[ing] to an arbitration agreement or award falling under the Convention[,]'" including Jones Act claims. *Trifonov v. MSC Mediterranean Shipping Co. SA*, 590 F. App'x 842, 845 (11th Cir. 2014). As the Eleventh Circuit clarified in *Bautista*, "the Convention recognizes no exception for seamen employment contracts." *Id.* at 844 (quoting *Bautista*, 396 F.3d at 1295-1300).

If the agreement satisfies those jurisdictional prerequisites, the district court must order arbitration unless any of the Convention's affirmative defenses apply. *Bautista*, 396 F.3d at 1294-95. The Convention requires that courts enforce an agreement to arbitrate unless the agreement is "null and void, inoperative or incapable of being performed." Convention, art. II(3). "The limited scope of the Convention's null and void clause 'must be interpreted to encompass only those situations — such as fraud, mistake, duress, and waiver — that can be applied neutrally on an international scale.'" *Id.* at 1302 (quoting *DiMercurio v. Sphere Drake Ins. PLC*, 202 F.3d 71, 80 (1st Cir. 2000)).

Non-signatories can seek arbitration under the doctrine of equitable estoppel and Chapter 1 of the FAA. As the Supreme Court clarified, the "Convention does not conflict with the enforcement of arbitration agreements by nonsignatories under domestic-law equitable estoppel doctrines." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1648 (2020).

8

### C.  Motion to Remand

Removal from state court to federal court is proper in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). To establish original jurisdiction, a lawsuit must satisfy the jurisdictional prerequisites of either federal question jurisdiction pursuant to 28 U.S.C. § 1331 or diversity jurisdiction pursuant to 28 U.S.C. § 1332. Federal question jurisdiction exists when the civil action arises "under the Constitution, laws, or treaties of the United States." *Id.* at § 1331. Diversity jurisdiction exists when the parties are citizens of different states, and the amount in controversy exceeds $75,000. *See id.* at § 1332(a).

The removing party has the burden "to demonstrate that federal jurisdiction exists." *Kirkland v. Midland Mortg. Co.*, 243 F.3d 1277, 1281 n.5 (11th Cir. 2001). "[T]he right of removal is strictly construed, as it is considered a federal infringement on a state's power to adjudicate disputes in its own courts." *Rietwyk v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2219730, at *1 (S.D. Fla. June 2, 2010) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941).

### D.  Subject Matter Jurisdiction

Subject matter jurisdiction in this case ultimately depends on the applicability of the arbitration clause in the SEA as to all Defendants. If the arbitration clause in the SEA is applicable to all of the claims at issue, then the Court has subject matter jurisdiction to compel arbitration of all of those claims pursuant to the Convention and its enabling legislation, 9 U.S.C. § 201, *et seq*; *see also Outokumpu Stainless USA,* 140 S. Ct. at 1644. However, if the arbitration clause of the SEA is not applicable to some or all of the claims at issue, then the Court may not have subject matter jurisdiction of those claims under 9 U.S.C. § 205.

In the alternative, the Court may have subject matter jurisdiction under 28 U.S.C. § 1333, which states that "district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." However, "[a]s a general rule, a Jones Act claim brought in a state forum may not be removed to federal court absent a showing the Jones Act claim has been fraudulently pled." *Bendlis v. NCL (Bahamas), Ltd.*, No. 14-24731-CIV, 2015 WL 1124690, at *2 (S.D. Fla. Mar. 11, 2015). Jones Act claims not covered by the Convention must be remanded to the state court where Plaintiff originally brought his action.

## III. DISCUSSION

### A. Personal Jurisdiction Over Defendants Gold, R. Operations, and Fountainhead Marine Limited

Defendants argue that this Court does not have personal jurisdiction over Defendants Gold, R. Operations, and Fountainhead Marine Limited, as none have sufficient contacts with Florida. Defendants therefore contend that they are not covered under Florida's long-arm statute and exercising jurisdiction over them would violate due process. Plaintiff responds that there is personal jurisdiction over these Defendants under Florida's long-arm statute. Fla. Stat. §§ 48.193(1)(a)(1), (2). Plaintiff distinguishes the cases cited by Defendants as those decisions found there was no personal jurisdiction over a vessel that merely had "certain port stops in the state of Florida or other attenuated contacts." ECF No. [15] at 15. Plaintiff contends that the tortious acts occurred both in New York and in Miami, Florida, where the failure to properly treat, provide timely maintenance and cure, and conversion took place.

A court considers two questions when determining whether it has specific personal jurisdiction over a defendant: (1) whether personal jurisdiction exists under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of

the Fourteenth Amendment to the U.S. Constitution. *See*, *e.g.*, *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). Courts must apply Florida law when doing this inquiry, as expounded either by the Florida Supreme Court or the Florida District Courts of Appeal. *See*, *e.g.*, *Musiker v. Projectavision, Inc.*, 960 F. Supp. 292, 294 (S.D. Fla. 1997). Under Florida law, the plaintiff bears the burden of proving personal jurisdiction. *Id.*

Florida's long-arm statute provides there is personal jurisdiction over a defendant if the cause of action arises from "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state" or from "[c]ommitting a tortious act within this state." Fla. Stat. §§ 48.193(1)(a)(1), (2). When considering whether jurisdiction would violate due process, in "specific personal jurisdiction cases, [courts] apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 474-75 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### i.   Jurisdiction Under Florida's Long-Arm Statute

There is specific personal jurisdiction over Defendants Gold, R. Operations, and Fountainhead Marine Limited under Florida's long-arm statute, granting specific jurisdiction over defendants when the cause of action arises from "[c]ommitting a tortious act within this state." Fla. Stat. § 48.193(1)(a)(2). The Court need not reach the question of whether Defendants were

"[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state" Fla. Stat. § 48.193(1)(a)(1).

The allegations in the Complaint are sufficient to bring the alleged tortious conduct within Florida's long-arm statute granting specific jurisdiction for cause of actions arising from "[c]ommitting a tortious act within this state." Fla. Stat. § 48.193(1)(a)(2). Under Count I, Plaintiff alleges that Defendants R. Operations and Fountainhead Marine Limited failed to provide Plaintiff with a reasonably safe place to work under the Jones Act, in part by failing to train the crew and failing to hire enough crew members. ECF No. [1-2] at 8-11. In Count II, Plaintiff alleges that the crew was unfit, leading to the Yacht's unseaworthiness. ECF No. [1-2] at 11-12. At least part of those causes of action occurred from within Florida, where Defendants R. Operations and Fountainhead Marine Limited hired and trained crewmembers like Plaintiff or failed to do so.[1] As Plaintiff alleges, it appears from the record that those decisions were "made in Miami where the vessel's base of operations is located." ECF No. [15] at 14.

Plaintiff alleges Defendants R. Operations, Fountainhead Marine Limited, and Gold failed to treat Plaintiff until reaching Miami, Florida. ECF No. [1-2] at 7. This alleged conduct is at the root of Count III for failure to provide maintenance and cure and Count IV for failure to treat. His subsequent repatriation occurred from Miami, Florida. Defendants allegedly refused to return Plaintiff's belongings in Miami, which is the basis of Plaintiff's Count VI for conversion. ECF No. [1-2] at 7-8. Those allegations demonstrate that the "alleged tort must have caused injury in Florida," *Musiker*, 960 F. Supp. at 296, and bring Defendants' conduct within the scope of Florida's long-arm statute.

---

[1] Even if Defendants contest Plaintiff's characterization of Miami as the Yacht's home port, they do not contest that the Yacht made regular stops in Miami, that R. Operations hired and trained Plaintiff in Miami, and that R. Operations and Fountainhead Marine Limited's representative, Lampert, lives in Florida.

### ii.    Defendant's Contacts with the Forum

Having determined that the long-arm statute applies, the Court considers the first prong of the due-process test. Defendants R. Operations, Fountainhead Marine Limited, and Gold argue that jurisdiction would violate due process on all three prongs, because they cannot reasonably anticipate being subject to the jurisdiction of a Florida court for an incident that occurred in New York in the absence of minimum contacts with Florida. ECF No. [5] at 20.

As detailed in the subsection above, Defendants R. Operations, Fountainhead Marine Limited, and Gold allegedly "committed a substantial aspect of the alleged tort in Florida" *Musiker*, 960 F. Supp. at 296. Plaintiff's claims "arise out of or relate to at least one of the defendant's contacts with the forum" under the first prong of the due process analysis. *Louis Vuitton*, 736 F.3d at 1355.

### iii.   Purposeful Availment

Under the second prong of the due-process test, R. Operations, Fountainhead Marine Limited, and Gold also "purposefully availed [themselves] of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws." *Louis Vuitton*, 736 F.3d at 1355. The contacts between Defendants and Florida far exceed those in the cases cited by Defendants, in both quantity and relatedness to the claims alleged. ECF No. [15] at 17 (citing *Musiker*, 960 F. Supp. at 295; *Ocean Chem. Transp., Inc. v. Cotton*, 702 So. 2d 1272 (Fla. 1st DCA 1997); *Price v. Point Marine, Inc.*, 610 So. 2d 1339, 1341-2 (Fla. 1st DCA 1992); *Spanier v. Suisse-Outremer Reederei A.G.*, 557 So. 2d 83, 83 (Fla. 3d DCA 1990)).

In *Musiker*, the fraudulent misrepresentation at issue was by telephone and was not committed in Florida because the defendant "with the possible exception of two instances, was not in Florida at the time." 960 F. Supp. at 296. Other cases cited by Defendants as insufficient for

personal jurisdiction included less significant contacts between defendants and Florida than in this case. *See*, *e.g.*, *Ocean Chem. Transp., Inc. v. Cotton*, 702 So. 2d 1272 (Fla. 1st DCA 1997) (finding some stopovers in Florida, some solicitation over the phone and the maintenance of an escrow account insufficient for personal jurisdiction); *Price v. Point Marine, Inc.*, 610 So. 2d 1339, 1341-2 (Fla. 1st DCA 1992) (finding that "occasional solicitation of business and three incidents of appellee's presence in the state," with no evidence that the solicitation was accepted, was not enough for specific jurisdiction); *Spanier v. Suisse-Outremer Reederei A.G.*, 557 So. 2d 83, 83 (Fla. 3d DCA 1990) (finding that a "vessel's sporadic visits and other contacts with Florida did not constitute the 'continuous and systematic' activity necessary to sustain a claim of personal jurisdiction" under the prong of Florida's long-arm statute requiring "substantial and not isolated activity within this state.")

The contacts between Florida and R. Operations, Fountainhead Marine Limited, and Gold are much more extensive. Plaintiff alleges the Yacht has its home port in Miami, Florida. ECF [15-1] at ¶ 15. Defendants dispute that the Yacht had a home port in Miami, and instead argue that it "has no regular home port and travels throughout the Caribbean, the Bahamas, Dominican Republic, Norway, Scotland, the Mediterranean, and the East Coast of the United States." ECF No. [5-5] at 2. Even if Defendants are correct, contacts between the Yacht and Florida are sufficient for specific jurisdiction in Florida:

- In their respective declarations, R. Operations and Fountainhead Marine Limited concede they have a representative who resides in Florida.[2]

---

[2] Defendant Lampert is a representative of both R. Operations and Fountainhead Marine Limited. ECF No. [5-2], [5-3]. Plaintiff alleges that Defendant Lampert resides on Indian Creek Island, Florida and maintains an office in Bay Harbor, Florida. ECF No. [15-1] at 8, §§ 21-22. Defendant Lampert does not contest this in his declaration. ECF No. [5-4] at 1.

- Plaintiff alleges that the majority of the Yacht's fuel and provisions were taken aboard in Miami. Defendants do not contest this. ECF No. [15-1] at 8.

- Plaintiff explains the Yacht has never been to the Cayman Islands during his two years of employment, which Defendants do not contest. ECF No. [15] at ¶ 14.

- R. Operations employed, trained, and repatriated Plaintiff from Miami. ECF No. [1-2] at 7.

- Miami was the place of contract and hire of the Plaintiff. ECF No. [15-1] at 7.

- Plaintiff's trial period on the Yacht was also in Miami. ECF No. [15-1] at 7.

- The contract at issue was signed in Miami, Florida. ECF No. [5-1] at 6.

- Captain Gold worked on the Yacht and resided in Miami at the time of the incident. ECF No. [1-2] at 4. Captain Gold states that he is South African and currently domiciled in South Africa but does not rebut Plaintiff's claim that he resided in Miami in and around the Sea Bob incident. ECF No. [5-5] at 2.

Defendants R. Operations, Fountainhead Marine Limited, and Gold "purposefully availed [themselves] of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws." *Louis Vuitton*, 736 F.3d at 1355. The second prong of the due process analysis is satisfied.

### iv.    Traditional Notions of Fair Play and Substantial Justice

Defendants argue that jurisdiction over them would violate traditional notions of fair play and substantial justice because they would have to travel "from foreign lands to defend a lawsuit in a state with which they have minimal contact." ECF No. [5] at 21.

The record does not support Defendants' contention. As mentioned above, R. Operations and Fountainhead Marine Limited's only named representative in the record, Lampert, resides on

Indian Creek Island in Miami-Dade County, Florida. ECF No. [5-2], [5-3]. At least some hiring and training decisions were executed by R. Operations and Fountainhead Marine Limited in Florida. *See, e.g.* ECF No. [15-1] at 7; ECF No. [5-1] at 6. Gold previously worked on the Yacht in Florida. ECF No. [1-2] at 4. Those contacts between the Yacht at issue and Florida are sufficient to grant specific jurisdiction over the Defendants.

Due to the contacts and purposeful availment of R. Operations, Fountainhead Marine Limited and Gold in Florida at the time of the Sea Bob incident, the exercise of personal jurisdiction over them comports with "traditional notions of fair play and substantial justice." *Louis Vuitton*, 736 F.3d at 1355. There is specific personal jurisdiction over entities R. Operations, Fountainhead Marine Limited, and individual Gold in Florida. The third prong of the due process analysis is satisfied.

At bottom, there is jurisdiction under Florida's long arm statute and the exercise of personal jurisdiction against R. Operations, Fountainhead Marine Limited, and Gold comports with the due process test. Accordingly, there is specific personal jurisdiction over those three Defendants.

## B. Compelling Arbitration for Counts I, III and IV Against Contract Signatory R. Operations

### i.    Arbitration Agreement in Writing

In his Motion to Remand, Plaintiff specifically argues that there is no Arbitration Agreement in writing due to a conflict between the arbitration clause and the choice-of-forum clause of the SEA. ECF No. [10] at 4-6. As such, Plaintiff contends there is no "agreement in writing to arbitrate the dispute within the meaning of the Convention." *Bautista*, 396 F.3d at 1294 n. 7.

As noted, the arbitration clause of the SEA, contained in Schedule B, provides that [s]hould there be any dispute arising out of the Agreement, it shall be submitted for arbitration in

the Cayman Islands." ECF No. [1-1] at ¶ 28.1. ECF No. [15] at 5. Plaintiff argues that it conflicts

with Section 6.9 of the SEA, contained in Schedule A, which provides that "[t]he parties submit

to the exclusive jurisdiction of the *courts* of Cayman Islands." ECF No. [15] at 5 (emphasis added).

Plaintiff points out Section 6.1 of the Schedule A, which provides the following:

> The terms of your employment are governed by this Employment Agreement and
> the General Terms and Conditions. If there is any inconsistency between this
> Employment Agreement ["Schedule A"] and the General Terms and Conditions
> ["Schedule B"], the terms of this Employment Agreement ["Schedule A"] will
> prevail.

ECF No. [15] at 4-5.

Plaintiff argues that the reference to the "courts" in the choice-of-forum clause in Section

6.9 of the Schedule A is inconsistent with the arbitration clause in Section 28.1, Schedule B. Under

Section 6.1, the terms of Schedule A must prevail over those of Schedule B, and so the choice-of-

forum clause prevails over the arbitration clause. There is therefore no "agreement in writing to

arbitrate the dispute within the meaning of the Convention" granting federal jurisdiction under

9 U.S.C. § 205 so the matter must be remanded to state court. ECF No. [15] at 5-6. Defendants

respond that there is no such ambiguity when a choice-of-forum clause and an arbitration clause

co-exist. ECF No. [30] at 2-3 (quoting *Escobal v. Celebration Cruise Operator, Inc.*, 482 F. App'x

475, 476 (11th Cir. 2012)).

The Court agrees with Defendants. "Traditional contract-interpretation principles make

contract interpretation a question of law, decided by reading the words of a contract in the context

of the entire contract and construing the contract to effectuate the parties' intent." *Feaz v. Wells

Fargo Bank*, N.A., 745 F.3d 1098, 1104 (11th Cir. 2014). Moreover, "[a]n interpretation giving

'reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless

or inexplicable.'" *In re FFS Data, Inc.*, 776 F.3d 1299, 1304 (11th Cir. 2015) (quoting *Princess*

*Cruise Lines,* 657 F.3d at 1218). Under Plaintiff's interpretation, the arbitration clause would be rendered meaningless because it would be voided by the choice-of-forum clause. The arbitration clause "would have no purpose, and that is an interpretative no-no." *Princess Cruise Lines,* 657 F.3d at 1218 (ruling that the terms "relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company" must narrow a broader arbitration provision, or those words would have no purpose). Instead, it is possible to give reasonable meaning to both the choice-of-forum clause and arbitration clause, especially in light of the limited nature of the arbitration clause. The arbitration clause refers to arbitration in the Cayman Islands for "any dispute arising out of the Agreement." ECF No. [1-1] at ¶ 28.1. Other disputes between Plaintiff and R. Operations, falling outside of the arbitration clause, can still be litigated.

The Eleventh Circuit's decision in *Escobal* is instructive. 482 F. App'x at 476. There, the plaintiff similarly argued that the arbitration clause was ambiguous due to a litigation choice-of-forum provision designating a Bahamian court. The Eleventh Circuit disagreed, stating that "[t]he litigation choice-of-forum provision cited by Escobal does not render the arbitration provision ambiguous." *Escobal*, 482 F. App'x at 476 (quoting *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 395 (5th Cir. 2002); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 285 (2d Cir. 2005) (*abrogated on other grounds* by *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, 130 S. Ct. 2847, 2856, 177 L. Ed. 2d 567 (2010))).

As detailed above, there is no conflict between the arbitration clause in Schedule B of the SEA and the choice-of-forum clause in Schedule A of the SEA. The Court therefore need not turn to Section 6.1 of the SEA's Schedule A to reconcile a conflict between Schedule A and Schedule B of the SEA. There is an "agreement in writing to arbitrate the dispute within the meaning of the

Convention." *Bautista*, 396 F.3d at 1294 n. 7. There is no genuine dispute as to any material fact concerning the formation of such an agreement binding the parties. *Bazemore*, 827 F.3d at 1333.

### ii.     The Four Jurisdictional Prerequisites Under the Convention

The parties agree that the remaining three prongs of the Convention are satisfied. "(2) the agreement provides for arbitration in the territory of a Convention signatory; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states." *Bautista*, 396 F.3d at 1294 n. 7. The Court agrees and finds that this dispute is governed by the arbitration clause of the SEA.[3] There is no genuine dispute as to any material fact concerning the formation of such an agreement. *Bazemore*, 827 F.3d at 1333. The four jurisdictional prerequisites are accordingly met for the Court to order arbitration for claims between R. Operations and Plaintiff. Under that inquiry, "[i]n the absence of an affirmative defense, a district court must compel arbitration under the Convention if [the] four jurisdictional requirements are met." *Alberts v. Royal Caribbean Cruises, Ltd.*, 834 F.3d 1202, 1204 (11th Cir. 2016).

### iii.    Compelling Arbitration Against R. Operations

Next, the Court turns to the question of which claims Plaintiff and SEA signatory R. Operations agreed to arbitrate. To do so, the Court looks at whether each claim against R. Operations is covered by the arbitration clause.

The SEA's arbitration clause states: "Should there be any dispute arising out of the agreement, it shall be submitted for arbitration in the Cayman Islands." Section 28.1, Schedule B,

---

[3] Under the second jurisdictional prerequisite, the Canary Islands are governed by the Convention. *See* Convention, *List of Contracting States*, available at https://www.newyorkconvention.org/list+of+contracting+states (last visited Feb. 14, 2024). Under the third jurisdictional prerequisite, the employment relationship at issue is a commercial legal relationship. Under the fourth, at least one party to the agreement is not an American citizen: the Plaintiff is a South African citizen and R. Operations is incorporated in the Cayman Islands.

SEA, ECF No. [1-1] at 17. Plaintiff asserts the following five claims against R. Operations: Count I for Jones Act Negligence, Count II for Unseaworthiness, Count III for Failure to Provide Maintenance and Cure, Count IV for Failure to Treat, and Count VI for Conversion. ECF No. [1-2] at 3-19. To require arbitration, Plaintiff's claims must "aris[e] out of the agreement" i.e. arise out of the SEA.

Defendants argue all the claims against R. Operations "aris[e] out of the agreement" and so are covered by the arbitration clause. ECF No. [5] at 8. Defendants rely on *Northrop & Johnson* and *Cooper* to argue the arbitration clause should be read broadly. ECF No. [5] at 8 (quoting *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 473 (11th Cir. 2021) ("We have consistently held that such language is broad in scope"); *Cooper v. Meridian Yachts*, *Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (holding that a clause that covered "all disputes arising out of or in connection with" an agreement was "clearly meant to be read broadly")). Plaintiff responds that, unlike in *Cooper* and *Northrop & Johnson*, the language at issue here is narrower and contains no clause that any dispute "in connection with" the agreement should be submitted to arbitration. *See Cooper*, 575 F.3d at 1162; *Northrop & Johnson*, 855 F. App'x at 473; ECF [26] at 2. Only a "dispute arising out of the agreement … shall be submitted for arbitration in the Cayman Islands." ECF No. [1-1] at 17.

As the Eleventh Circuit explains, "[t]he term 'arising out of' is broad, but it is not all encompassing." *Princess Cruise Lines,* 657 F.3d at 1218. To determine if a cause "arises out" of an agreement, a court asks "whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia*, 248 F.3d at 1116. In other words, "'[a]rising out of' requires the existence of some direct relationship between the dispute and the performance of duties specified by the contract." *Princess Cruise Lines,* 657 F.3d at 1218 (quoting

*Telecom Italia*, 248 F.3d at 1116).

The Court looks to the contractual text to determine whether a claim arises out of the agreement. A court may not expand a clause's scope beyond the contractual text.[4] The Eleventh Circuit applied this methodology in *Princess Cruise Lines*, where a broader arbitration clause, contained within Plaintiff's employment agreement, was at issue. There, the arbitration clause required that "the dispute between Doe and the cruise line must relate to, arise from, or be connected with her crew agreement or the employment services that she performed for the cruise line" for arbitration to be compelled. *Princess Cruise Lines,* 657 F.3d at 1217-18.[5] Still, the Court observed that, "[t]he arbitration provision is broad, but not limitless." *Id.* at 1217-18. It proceeded to analyze each claim to determine which claims relate to, arise out of, or are connected with Doe's employment agreement.

The Eleventh Circuit divided the claims into two types: first, the claims for tortious conduct that did not relate to, arise out of, or were not connected with Doe's employment agreement or her duties for Princess Cruise Lines as a bar server. In the case, five employees had drugged and raped Doe, and Doe brought claims pursuant to those torts. The Eleventh Circuit found that "[t]he cruise

---

[4] For instance, in *Cooper*, the Eleventh Circuit held that "[a] choice of law provision that relates only to the agreement will not encompass related tort claims." *Cooper*, 575 F.3d at 1162.

[5] In full, the arbitration clause stated:

> [T]he Company and crew member agree that *any and all disputes, claims, or controversies whatsoever* (whether in contract, regulatory, tort or otherwise and whether pre-existing, present or future and including constitutional, statutory, common law, admiralty, intentional tort and equitable claims) *relating to or in any way arising out of or connected with the Crew Agreement*, these terms, or services performed for the Company, including but not limited to wage and benefit matters, employment applications, wrongful termination or discrimination claims, property loss or damage, personal injury, death or any other claim, no matter how described, pleaded or styled [collectively, "Disputes"] between the crew member and the Company or others, including against the master, shipowner, vessel, vessel operator, charterer, or any other third party, including also, but not limited to, Princess Cruises, P&O Cruises Australia, and Cunard Line, *shall be referred to and resolved exclusively by binding arbitration....*

*Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1214-15 (11th Cir. 2011) (emphasis in original).

line could have engaged in that tortious conduct even in the absence of any contractual or employment relationship with Doe." *Id.* at 1219 (citation omitted).[6] Those claims were not covered by the arbitration clause and could be litigated.[7]

Second, the Eleventh Circuit found that the other half of Doe's claims arose directly from her status as an employee of Princess Cruise Lines and covered by the employment agreement.[8] The Eleventh Circuit explained that "[a]ll five of these claims are based on allegations that are dependent on her status as a seaman employed by the cruise line and the rights that she derives from that employment status." *Id.* at 1221. More plainly, they were "based on the employment relationship between the parties" and so fell "within the scope of the arbitration provision." *Id*.

In *Wexler v. Solemates Marine, Ltd.*, this Court applied the analysis in *Princess Cruise Lines* to another Seafarer Employment Agreement and found that the plaintiff's claims that were the "immediate, foreseeable result of [Employer's] performance (or lack thereof) of contractual duties" fell within the scope of the arbitration clause. No. 16-CV-62704, 2017 WL 979212, at *7 (S.D. Fla. Mar. 14, 2017). There, the claim for Jones Act negligence and the claim for failure to provide maintenance and cure arose out of the failure of the employer to comply with its healthcare requirement duties, as spelled out in the plaintiff's Seafarer Employment Agreement. *Id.*

The Court proceeds to apply the Eleventh Circuit's methodology in Doe to each count against R. Operations to determine if the claims are covered by the SEA's arbitration clause's

---

[6] The Eleventh Circuit clarified that "[t]he incidental fact that Doe might not have been on the cruise ship if she had not been working for the cruise line does not mean that her claims relate to, arise from, or are connected with the crew agreement and the services that she performed as an employee." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1219 (11th Cir. 2011).

[7] These were claims against the cruise ship for (1) false imprisonment (2) intentional infliction of emotional distress (3) spoliation of evidence (4) invasion of privacy; and (5) fraudulent misrepresentation pursuant to five employees on the ship drugging and raping Doe.

[8] Those claims included (1) two counts of personal injury under the Jones Act, 46 U.S.C. § 30104; (2) one count of unseaworthiness and (3) one count of maintenance and cure, the last two being maritime or admiralty law remedies for seamen and (4) a claim under the Seaman's Wage Act.

language.

### a. Count I - Jones Act Negligence

Count I alleges a negligence claim against Defendant R. Operations under the Jones Act, 46 U.S.C. § 30104. Plaintiff alleges R. Operations, Fountainhead Marine Limited, and Lampert "as owners and operators of the [Yacht] and employer of the Plaintiff, owed Plaintiff the duty to use due care in providing Plaintiff with a workplace that was reasonably safe[.]" ECF No. [1-2] at 10-11. Defendants argue that this Count, like all of Plaintiff's claims, is covered by the arbitration clause. ECF No. [5] at 8, 11. Plaintiff argues the arbitration clause is voided by the choice-of-forum clause. ECF No. [15] at 4-6.

This claim is covered by the arbitration clause because "the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia*, 248 F.3d at 1116. Here, the negligence alleged is an immediate, foreseeable result of Employer R. Operations' performance (or nonperformance) of the contractual duties detailed in the SEA. R. Operations' duties in case of Plaintiff's occupational illness, sickness or injury are spelled out in Section 10 ("Insurance Details") and 11 ("Health Benefits) of the Agreement. ECF No. [5-1] at ¶ 10-11. Plaintiff's Jones Act negligence claims allege that R. Operations failed to perform those duties.[9]

This Court similarly found that claims brought under the Jones Act alleging failure to

---

[9] For instance, Section 11.1 explains that "[t]he Seafarer will if he/she becomes incapacitated as a result of occupational illness, sickness or injury be provided with any medical care on-board should that become necessary, free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise. Where practicable and appropriate, the Seafarer will be given leave to visit a qualified medical doctor or dentist in ports of call for the purpose of obtaining treatment." ECF No. [5-1] at ¶ 11.1. This is precisely one of the duties that the complaint alleges was not respected by Defendant under Jones Act negligence: Count I, paragraph 38.i of the complaint states that "Defendants failed to manage Plaintiff's medical care properly after Plaintiff was injured." ECF [1-2] at 10.

provide care to be within an arbitration clause's scope where they fell "squarely within the scope of … two provisions" of plaintiff's SEA on "Healthcare Requirements, Tests and Plan[.]" *Wexler.*, 2017 WL 979212 at *7. Here the performance or nonperformance of contractual duties immediately and foreseeably resulted in Plaintiff's Jones Act negligence claim. *Telecom Italia*, 248 F.3d at 1116. Plaintiff's first claim against R. Operations therefore arises out of the agreement and is covered by the arbitration clause.

### b. Count II - Unseaworthiness

In Count II, Plaintiff alleges that the Yacht was "unsafe and unfit due to the conditions created by Defendants." ECF No. [1-2] at 11. Defendants summarily state that "the arbitration provision requires arbitration for the resolution of all of Plaintiff's disputes." ECF No. [5] at 8. Plaintiff does not discuss with specificity whether this Count "arises out" of the SEA and so is covered by the arbitration clause.

Defendants do not point to a section of the SEA from which Count II arises. The Court looks to the SEA and finds that it is silent about R. Operations' or other Defendants' duty to create a fit or safe environment.  Plaintiff's second claim for unseaworthiness does not "aris[e] out of the agreement." In contrast to cases where related claims were found to be arbitrable under broader arbitration clauses, here the agreement is silent on R. Operations' duty to provide a seaworthy yacht to its employees. Count II does not arise out of the agreement, so it is not covered by the arbitration clause.

### c. Count III - Failure to Provide Maintenance and Cure

In Count III, Plaintiff alleges that R. Operations failed to provide maintenance and cure under General Maritime Law. ECF No. [1-2] at 12. Plaintiff alleges that "the amounts provided by Defendants were grossly inadequate to pay for the Plaintiff's daily expenses." ECF No. [1-2] at

13. He also alleges that R. Operations, Fountainhead Marine Limited, and Lampert "willfully and callously delayed, failed and refused to pay [Plaintiff's] entire maintenance and cure" until Plaintiff involved the help of counsel. ECF No. [1-2] at 12-13.

The SEA covers compensation due to Plaintiff in the event he becomes "sick or injured, hospitalized or declared unfit for work." ECF No. [5-1] at ¶ 11.3. In the event this occurs, "the Seafarer will be paid their normal basic Salary … as sick pay, up to a maximum of 112 days (16 weeks) or until recovery of health (whichever shall be the earlier)." ECF No. [5-1] at 11.3. The Section further details Employer's salary obligations "[i]n the event of repatriation." ECF No. [5-1] at 11.3. The failure to provide maintenance and cure at issue here is "an immediate, foreseeable result of the performance of contractual duties[,]" or lack thereof. *Telecom Italia*, 248 F.3d at 1116; *see also Wexler*, 2017 WL 979212 at *7 (S.D. Fla. Mar. 14, 2017). Count III for maintenance and cure against R. Operations therefore arises out of the SEA.

### d. Count IV - Failure to Treat

Similarly, Count IV alleges that "[i]t was the duty of Defendants to provide Plaintiff with prompt, proper and adequate medical care." ECF No. [1-2] at 13-14. Plaintiff alleges that "Defendants, through the physicians and nurses chosen by it, negligently failed to promptly provide Plaintiff with prompt, proper, adequate, and complete medical care." ECF No. [1-2] at 14. Like in *Wexler*, the agreement is integral to determining what those duties are, as detailed in Section 11 of the SEA. *See Wexler v. Solemates Marine, Ltd.*, 2017 WL 979212, at *7. Count IV against R. Operations arises out of the SEA.

### e. Count VI - Conversion

Count VI alleges that Defendants have not returned his "personal effects." ECF No. [1-2] at 16-17. Though the agreement discusses Employer's salary obligations "[i]n the event of

repatriation[,]" it does not address the return of Plaintiff's personal effects. ECF No. [5-1] at 11.3. As such, it differs from the SEA this Court reviewed in *Wexler*, where plaintiff's employer had failed to return property plaintiff left on the vessel. 2017 WL 979212 at *6. In *Wexler*, the SEA contained a clause stating that the "Yacht Owner will meet the cost of return of your property left on board to you or your next of kin." *Id.* at 7. No such language exists in the SEA here. Count VI therefore lies outside of Plaintiff's arbitration clause and does not "arise" out of the SEA.

In sum, the claims against R. Operations for Count I for Jones Act negligence, Count III for failure to provide maintenance and cure, and Count IV for failure to treat against contract signatory R. Operations are "dispute[s] arising out of the agreement" and covered by the arbitration clause. ECF No. [1-1] at 17 (Section 28.1 of Schedule B of Seafarer Employment Agreement). In contrast, Count II for unseaworthiness and Count VI for conversion against R. Operations do not "arise" out of the SEA.

There is "no genuine dispute as to any material fact concerning the formation of [] an [arbitration] agreement" between Plaintiff and R. Operations, nor as to which claim is covered by the agreement. *Bazemore*, 827 F.3d at 1333. Moreover, Plaintiff has not "show[n] cause why the court should not compel arbitration" as to those claims. *Sims*, 336 F. Supp. 2d at 1324. The Court therefore compels arbitration between Plaintiff and R. Operations on Count I, III, and IV.

## C.  The Doctrine of Equitable Estoppel and Non-Signatories to the Contract

### i.    Choice of Law

The parties disagree whether arbitration can be compelled as to the Defendants who did not sign the SEA, Fountainhead Marine Limited, Lampert, Camper, Catlin, and Gold ("Non-Signatories"), under the doctrine of equitable estoppel. Non-Signatories seek to compel arbitration under the doctrine of equitable estoppel, which Plaintiff resists. Non-Signatories can seek

arbitration under the doctrine of equitable estoppel under the Convention. *Outokumpu Stainless USA*, 140 S. Ct. at 1648.

The parties appear to disagree on which law should apply to the action: the law of the Cayman Islands or of the United States. Plaintiff argues that because Non-Signatories fail to carry their burden to show that Cayman Islands law controls, they cannot compel arbitration under the doctrine of equitable estoppel. ECF No. [15] at 7. Defendants argue that the Court should use the federal common-law to determine whether to apply the equitable estoppel doctrine. ECF No. [30] at 6-7. Before analyzing whether Non-Signatories can invoke the arbitration clause under the doctrine of equitable estoppel, the Court first determines which law applies.

The question of whether to apply federal or state or foreign law when determining whether the doctrine of equitable estoppel applies under the Convention was not conclusively reached by the Eleventh Circuit. However, Judge Tjoflat noted in his concurrence that the Eleventh Circuit "must apply federal common law in determining whether equitable estoppel applies in New York Convention cases" such as this one. *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at *6 (Tjoflat, J., concurring) (11th Cir. July 8, 2022) (on remand from *Outokumpu Stainless USA,* 140 S. Ct. at 1637). Judge Tjoflat found that federal law should apply over state law or any other law. *Id.* This Court has followed Judge Tjoflat's concurrence and applied federal law to the question of whether equitable estoppel applies under the Convention. *See*, *e.g.*, *Prcic v. Carnival Corp.*, 641 F. Supp. 3d 1313, 1318 (S.D. Fla. 2022), appeal dismissed, No. 22-13852-JJ, 2023 WL 3450053 (11th Cir. Feb. 14, 2023). The Court similarly applies federal law to determine whether equitable estoppel applies to Non-Signatories here.[10]

---

[10] In the alternative, the Court finds that United States law would also apply if the Court applied the choice-of-law factors for Jones Act or maritime tort actions, laid out by the Supreme Court. The eight factors are: (1) the place of the wrongful act; (2) the flag under which the ship sails; (3) the allegiance or domicile of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of the contract

Under federal law, an arbitration clause "is a contractual right that cannot ordinarily be

---

between the injured party and the shipowner; (6) the accessibility of a foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations. *See Lauritzen v. Larsen*, 345 U.S. 571 (1953); *see also Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970) (adding the base of operations factor); *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2015 WL 3970546, at *4 (S.D. Fla. June 30, 2015) (citation omitted). Plaintiff argues the *Lauritzen* factors encourage the application of United States law. ECF No. [15] at 16-21. Defendants respond that all factors weigh against the application of United States law except the first factor, the place of the wrongful act. ECF No. [30] at 11.

The first factor points to United States law: under Count I of the Complaint, the place of the wrongful act is New York, where Plaintiff was injured. Under Count II, III, IV, V, VI, the place of the wrongful act is at least partly Miami, where Plaintiff alleges Defendants R. Operations Fountainhead Marine Limited and Lampert were negligent in hiring and outfitting the vessel, where Camper was negligent in managing the yacht, and where the Conversion tort occurred. It is not clear where the place of the wrongful act is for Count VII of negligence against Camper and Catlin. The second factor, the flag under which the ship sails, supports the application of the law of the Cayman Islands. The third factor, the allegiance of the injured party points to South African law, as the Plaintiff is South African and lives in South Africa. It also points to United States law, as Plaintiff resided to Miami at the time of the incident. The Court has looked to the allegiance of the Defendants in considering the fourth factor. *Belik v. Carlson Travel Grp., Inc.*, 26 F. Supp. 3d 1267, 1278 (S.D. Fla. 2013). Here, Defendants' allegiance points to no specific law. Lampert resides in Florida. R. Operations and Fountainhead Marine Limited state they are both incorporated in the Cayman Islands but represented by Lampert. ECF No. [1-2] at 4; ECF No. [5-3]; ECF No. [5-2]. The nationality of Camper is unclear, as Plaintiff alleges it is a Florida corporation and Defendants claim that Camper is registered in Switzerland. ECF No. [1-2] at 5, ECF No. [5-6]. The nationality of Catlin is unclear from the record. ECF No. [1-2] at 17. Gold is a South African citizen. ECF No. [5-5] at 2. The fifth factor is not relevant, since Non-Signatories did not enter into a contract with Plaintiff and "only factors relevant to the claims at issue [should] be considered." *Tarasewicz*, 2015 WL 3970546 at *4. The sixth factor does not point to a particular law as there is no reason to conclude that the Cayman Islands or the United States would be more accessible to any party here. Under the seventh factor, the law of the forum is Florida law, but it is entitled to little weight.

In addition, the eighth factor points to United States law. Under this factor, the Eleventh Circuit has clarified that a "complete choice of law analysis requires that [a court] examine the base of operations of all parties[,]" not just the shipowner's. *Cooper*, 575 F.3d at 1176. There is enough evidence to support that R. Operations, Fountainhead Marine Limited, and Lampert maintained a substantial base of operations in Florida at the time of the incidents alleged. Information in the record is insufficient to establish the base of operations of Defendants Gold, Camper and Catlin. Regarding R. Operations, Fountainhead Marine Limited, and Lampert: Fountainhead Marine Limited (the shipowner) and R. Operations were incorporated in the Cayman Islands. ECF No. [5-3]. The yacht's hailing port is Georgetown, Cayman Islands. ECF No. [5-5] at 2. R. Operations and Fountainhead Marine Limited's representative — Lampert — resides on Indian Creek Island, Florida and maintains an office in Bay Harbor, Florida. ECF No. [15-1] at ¶ 21-22. Plaintiff was interviewed before his employment by the Bosun and Chief Officer of the yacht in Miami, Florida. ECF No. [15-1] at 7. His trial period on the yacht was also in Miami. ECF No. [15-1] at 7. The SEA was signed in Miami, Florida. ECF No. [5-1] at 6. The majority of the yacht's fuel and provisions were taken aboard in Miami. ECF No. [15-1] at 8. The yacht has never been to the Cayman Islands during his two years of employment. ECF No. [15] at 7, ¶ 14. As the Supreme Court explained, "[t]he façade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States." *Rhoditis*, 398 U.S. at 310. Analyzing all factors, the Court finds that they predominately weigh in favor of United States law.

invoked by or against a party who did not sign the contract in which the provision appears." *Cooper*, 575 F.3d at 1169. "A party who is a non-signatory to an arbitration agreement may nevertheless compel arbitration under the doctrine of equitable estoppel in two circumstances: (1) "when the plaintiff-signatory must rely on the terms of the written agreement in asserting its claims," or (2) "when the plaintiff-signatory alleges substantially interdependent and concerted misconduct by the signatories and non-signatories, and such alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement[.]" *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 474 n. 4 (11th Cir. 2021) (citations omitted); *see also Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1119 (11th Cir. 2020); *Cooper*, 575 F.3d at 1169-70 (citation omitted); *see also Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1292 (S.D. Fla. 2016).

The doctrine of equitable estoppel "requires more than merely pointing to a broadly worded arbitration provision." *Cappello v. Carnival Corp.*, No. 12-22181-CIV, 2012 WL 3291844, at *5 (S.D. Fla. Aug. 10, 2012). "In determining whether the doctrine applies, the Court must examine the scope of the agreement containing the arbitration provision in light of the claims asserted." *Id.* That the claim against a non-signatory would not exist "but for" the relationship created by the signed agreement "is not enough to warrant equitable estoppel[.]" *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1174 (11th Cir. 2011); *see also Cappello*, 2012 WL 3291844 at *5-6. There is a difference "between an agreement that is factually significant, and one that serves as the basis for the plaintiff's claims." *Cappello*, 2012 WL 3291844 at *5-6; *see also Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1173 (11th Cir. 2011).

The Court therefore examines the claims against Non-Signatories to determine whether each Defendant can compel arbitration. For each, the Court will determine if either circumstance

where a non-signatory can compel arbitration under the doctrine of equitable estoppel applies.
*Northrop & Johnson*, 855 F. App'x at 474 n. 4.

### ii.   Equitable Estoppel for Non-Signatories

#### a.   Non-Signatories Lampert and Fountainhead Marine Limited

Defendants invoke the doctrine of equitable estoppel to argue that claims against Non-Signatories to the SEA are so "inextricably intertwined" with claims against signatory R. Operations, that they should be dismissed in favor of arbitration. ECF No. [5] at 10-14. Defendants argue that claims as to all Defendants "arise out of the same factual allegations." ECF No. [5] at 10. In addition, they claim that "Plaintiff himself cannot even identify his own employer or the [Yacht]'s owner" and does not differentiate between the three entities Lampert, R. Operations, and Fountainhead Marine Limited. ECF No. [5] at 11.

Plaintiff responds that equitable estoppel cannot apply under the Jones Act and general maritime law. ECF No. [15]. Plaintiff argues that he is suing Defendants Lampert and Gold under the borrowed servant doctrine and not under the SEA, so that the doctrine of equitable estoppel should not apply. ECF No. [15] at 10-13. Moreover, Plaintiff argues he is bringing claims based on general maritime law and not based in contract. ECF No. [15] at 11.[11]

The Court finds that the second circumstance for equitable estoppel applies here: "the plaintiff-signatory alleges substantially interdependent and concerted misconduct by the signatories and non-signatories, and such alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement[.]" *Northrop & Johnson*, 855 F. App'x at 474 n.

---

[11] Plaintiff relies on *Sarmiento Lopez v. CMI Leisure Mgmt., Inc*. to argue that his claims do not arise under the contract, but that case is inapposite. 565 F. Supp. 3d 1271, 1275 (S.D. Fla. 2021). In *Sarmiento*, the Court considered whether to look at a contractual agreement when reviewing a 12(b)(6) and 12(b)(3) motion, where the agreement was not included within the four corners of the complaint. *Sarmiento Lopez v. CMI Leisure Mgmt., Inc*., 565 F. Supp. 3d 1271, 1276 (S.D. Fla. 2021). The Court declined to do so.

4. First, the Court finds Plaintiff's claims against signatory R. Operations and Non-Signatories Lampert and Fountainhead Marine Limited are "one and the same." *Dimattina Holdings, LLC v. Steri-Clean, Inc.,* 195 F. Supp. 3d 1285, 1292 (S.D. Fla. 2016). Plaintiff does not specify who ordered him to forgo pain medication, go on night shifts, and wash, clean and repair the Yacht, thus aggravating his injury. ECF No. [1-2] at 7. However, Plaintiff alleges that Defendants R. Operations and Fountainhead Marine Limited are "paper companies with no employees and no offices in the Caymans." ECF No. [15] at 16. Moreover, he clarifies that "Lampert, through his agents Gold and/or Camper, controlled all aspects of the Plaintiff's work, including but not limited to: interviewing him; performing background checks and pre-employment physicals; making the determination to hire him; training him; assigning him to his position aboard; determining his specific work duties; supervising him; establishing rules and regulations for performance of his work; evaluating his performance for the purposes of maintaining his employment; setting the hours of work; and, maintaining the right to discipline/fire him." ECF No. [1-2] at 5. Finally, Plaintiff alleges Lampert pays "all operating expenses" of R. Operations and Fountainhead Marine Limited and is the "beneficial owner/real party in interest" of the Yacht. ECF No. [1-2] at 4-5. It follows that Plaintiff's claims against corporate entities R. Operations and Fountainhead Marine Limited are claims against Lampert. Plaintiff therefore asserts "substantially interdependent and concerted misconduct by the signatories and non-signatories[.]" *Northrop & Johnson*, 855 F. App'x at 474 n. 4 (citation omitted). The claims against R. Operations, Fountainhead Marine Limited, and Lampert are so substantially intertwined as to be practically indistinguishable.

Second, the Court finds that the "alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement[.]" *Northrop & Johnson*, 855 F. App'x at 474 n. 4. The SEA places duties on both "the Employer" — R. Operations, at least on paper — and "the

Case No. 23-cv-24257-BLOOM/Torres

Owner[,]" Fountainhead Marine Limited. Section 10.2 details duties of the owner in case of health

issues affecting the Seafarer:

> During the period of employment the Seafarer shall if he/she becomes incapacitated
> as a result of occupational illness, sickness or injury be entitled, if required, to
> medical attention at the Employer's (and/or the *Owner's*, where the context
> requires) discretion and expense, and the supply of necessary medicines and
> therapeutic devices and board and lodging away from home until his/her recovery
> or until his/her sickness or incapacity has been declared of a permanent character,
> subject to a maximum period of 112 days (16 weeks) from the day of injury or the
> commencement of the sickness or illness. For this purpose, the Manager and/or
> Employer shall (or procure that the *Owner* does) make arrangements to ensure there
> is appropriate insurance in place in accordance with Clause 10.1 to cover the
> Employer and the Owner fully against any legal claim the Seafarer may have by
> reason of injury, illness, sickness or death and against possible contingencies
> arising from the Agreement.
> ECF No. [5-1] at 10.2 (emphasis added).

The SEA consistently refers to the "Master, Employer, Owner and/or Yacht's appointed

Managers." ECF No. [5-1] at 8, Section 4.7, 4.9; at 8-9, Section 6.3; 9 at 7.1. Moreover, the alleged

misconduct for Counts I, III and IV is founded in or intimately connected with the obligations of

the SEA. As discussed in Section III.B.iii above, Plaintiff's claims for Count I for Jones Act

negligence, Count III for failure to provide maintenance and cure, and Count IV for failure to treat

rely in part on R. Operations' failure to uphold its contractual duties. The claims against Lampert

and Fountainhead Marine Limited "arise out of the same factual allegations of concerted conduct

by both" the signatory R. Operations and Non-Signatories Lampert and Fountainhead Marine

Limited, and thus "equitable estoppel is warranted" against them. *Citi Cars, Inc. v. Cox

Enterprises, Inc.*, No. 1:17-CV-22190-KMM, 2018 WL 1521770, at *11 (S.D. Fla. Jan. 22, 2018)

(citations omitted).

Counts I, III and IV against Lampert and Fountainhead Marine Limited therefore arise out

of "substantially interdependent and concerted misconduct by the signatories and non-signatories,

and such alleged misconduct is founded in or intimately connected with the obligations of the

underlying agreement[.]" *Northrop & Johnson*, 855 F. App'x at 474 n. 4. There is no genuine dispute of material fact that arbitration can be compelled by Lampert and Fountainhead Marine Limited against Plaintiff as to these three claims. This Court therefore grants Defendants' Motion to Compel Arbitration as to Lampert and Fountainhead Marine Limited, to the extent they arise out of the SEA.

Plaintiff has not met his burden to "show cause why the court should not compel arbitration" as to Counts I, III, and IV against Lampert and Fountainhead Marine Limited. *Sims*, 336 F. Supp. 2d at 1324. However, as discussed above, the Court cannot compel arbitration as to Counts II and VI as to Lampert and Fountainhead Marine Limited, since those counts are not covered by the contract's arbitration clause.

### b.   Non-Signatories Camper and Catlin

Plaintiff also brings claims against Defendants Camper and Catlin. Three Counts are against all Defendants: Count III for failure to provide maintenance and cure; Count IV for failure to treat; and Count VI for conversion. Count VII for breach of insurance contract is against only Camper and Catlin. There, Plaintiff asserts that despite being made aware of his injury, medical care, and inability to work, his demands for benefits under the policy "have been ignored or refused." ECF No. [1-2] at 18. Plaintiff alleges that both Camper and Catlin failed to "honor their obligations under the policy of insurance." ECF No. [1-2] at 18. Count V for negligence is against Camper for not exercising "reasonable care in the performance of … operational, maintenance, technical and financial services, so as to avoid exposing them to foreseeable hazards and risks of injury." ECF No. [1-2] at 15.[12]

---

[12] Upon remand, Defendants included Camper's group policy schedule for all employees of the yacht, *see* ECF No. [1-2] at 20-21. The policy details that Catlin "will provide the cover set out in the insurance policy." ECF No. [1-2] at 20.

The doctrine of equitable estoppel does not allow Defendants Camper or Catlin to compel arbitration as to any of the Counts. Here, neither of the two circumstances for Non-Signatories compelling arbitration are met. On each Count as to Camper or Catlin, Plaintiff either does not (1) "rely on the terms of the written agreement in asserting its claims," or (2) nor does he "allege[] substantially interdependent and concerted misconduct by the signatories and non-signatories, and such alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement[.]" *Northrop & Johnson*, 855 F. App'x at 474 n. 4.

Camper and Catlin cannot compel arbitration as to Counts III for failure to provide maintenance and cure and Count IV for failure to treat. At first view, both counts "allege[] substantially interdependent and concerted misconduct by the signatories and non-signatories." *Northrop & Johnson*, 855 F. App'x at 474 n. 4. Nevertheless, Camper and Catlin cannot compel arbitration as to these counts because the "alleged misconduct is [not] founded in or intimately connected with the obligations of the underlying agreement" nor does "the plaintiff-signatory [] rely on the terms of the written agreement in asserting its claims[.]" *Id.*

The SEA does not detail Camper's obligations to provide appropriate healthcare. Section 10.2 of the SEA gives the Employer or Owner — not the Manager — discretion to administer and pay for care for the Seafarer. ECF No. [5-1] at 10.2.[13] The written agreement also does not detail any duty for insurance provider Catlin. The requirements for equitable estoppel are not met, as neither

---

[13] The Contract touches on duties of the Manager (Camper), but not as related to any obligations that relate to Count III for failure to provide maintenance and cure nor Count IV for failure to treat. Section 10.2 specifically provides that the "Manager and/or Employer shall (or procure that the Owner does) make arrangements to ensure there is appropriate insurance in place … to *cover the Employer and the Owner* fully against any *legal* claim the Seafarer may have by reason of injury, illness, sickness or death." ECF No. [5-1] at ¶ 10.2 (emphasis added). The Manager also can determine medical screening procedures or be informed of the expiration of the expiration of a medical certificate. *See* ECF No. [5-1] at ¶ 10.3-4. Yet, Section 11 ("Health Benefits") does not name the Manager nor detail duties of the Manager as to Plaintiff's health benefits.

of the circumstances for equitable estoppel in *Northrop* apply: Plaintiff does not rely on the contract in bringing his claims nor is the alleged misconduct founded or intimately connected with duties in the contract. *See Northrop & Johnson*, 855 F. App'x at 474 n. 4. Therefore, neither Camper nor Catlin can compel arbitration as to Counts III and IV.

Neither Counts V or VII of the Complaint are brought against contract signatory R. Operations.[14] Counts V and VII therefore do not raise "substantially interdependent and concerted misconduct by the signatories and non-signatories[.]" *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 474 n. 4 (11th Cir. 2021). Catlin and Camper cannot compel arbitration as to these counts. As alleged, the Court cannot conclude that the Non-Signatories' "potential liability derives from the signatory's conduct and the claims against the non-signatory are based on the same operative facts and are inherently inseparable from the claims asserted against the signatory." *Tyman v. Ford Motor Co.*, 521 F. Supp. 3d 1222, 1227 (S.D. Fla. 2021). Therefore, neither Camper nor Catlin can compel arbitration as to Counts V and VII.

As already stated, Count VI for conversion does not arise from the agreement. Arbitration cannot be compelled as to any Defendant on this Count. As such, under the doctrine of equitable estoppel, Non-Signatories Camper and Catlin accordingly cannot compel arbitration on any count of the complaint.

> **c. Non-Signatory Gold**

Count III for failure to provide maintenance and cure, Count IV for failure to treat and Count VI for conversion are as to all Defendants, including Gold.

As stated, no arbitration can be compelled as to Count VI as to any Defendants because the

---

[14] Under Count V of the Complaint, the SEA is equally silent on the duties of Camper or Catlin to provide "reasonable care in the performance of … operational, maintenance, technical and financial services, so as to avoid exposing them to foreseeable hazards and risks of injury." ECF No. [1-2] at 15. Similarly, it is silent as to the insurance contract between Camper and Catlin.

SEA is silent with respect to this claim.

On the remaining Counts, Plaintiff does not give specifics as to Gold's role and responsibilities in providing maintenance and cure, or failure to treat. Plaintiff does not "allege[] substantially interdependent and concerted misconduct by the signatories and non-signatories[.]" *Northrop & Johnson*, 855 F. App'x at 474 n. 4. The SEA does not detail Gold's duties to provide appropriate healthcare. In fact, Gold is not mentioned in the SEA at all. The first *Northrop* circumstance does not apply, as Plaintiff does not "rely on the terms of the written agreement in asserting its claims[,]" nor does the second as the "alleged misconduct is [not] founded in or intimately connected with the obligations of the underlying agreement." *Id.* Therefore, Gold cannot compel arbitration under the doctrine of equitable estoppel.

**D.  Motion to Remand**

In his Motion to Remand, Plaintiff argues that there is no agreement to arbitrate due to the conflict between the choice-of-law and the arbitration clause in the SEA, thus mandating the case be remanded to state court since there is no federal question jurisdiction under 9 U.S.C. § 205. ECF No. [10] at 4-8. He further alleges that Jones Act claims are not removable under 28 U.S.C. § 1333, so that there is no federal question jurisdiction in this case. ECF No. [10] at 3-4. Defendants respond that though Jones Act claims are not typically removable to federal court, they can be removed when there is an arbitration agreement arising under Convention, *see* 9 U.S.C. § 205. ECF No. [20] at 4.

**i.  Jones Act Claims Under the Convention**

Defendants are correct that Jones Act claims can be removed — and arbitration compelled — when the claims relate to an arbitration agreement under the Convention. Even if Jones Act claims are not generally subject to removal, "the Convention authorizes the removal to federal

36

court of claims "relat[ing] to an arbitration agreement or award falling under the Convention[,]" including Jones Act claims. *Trifonov v. MSC Mediterranean Shipping Co. SA*, 590 F. App'x 842, 845 (11th Cir. 2014). As the Eleventh Circuit clarified, "the Convention recognizes no exception for seamen employment contracts." *Id.* at 844 (quoting *Bautista*, 396 F.3d at 1295-1300). Consequently, both the Eleventh Circuit and in-circuit district courts routinely compel arbitration of Jones Act claims "removed under 9 U.S.C. § 205 when they relate to an arbitration agreement under the Convention." *Trifonov v. MSC Mediterranean Shipping Co. SA*, 590 F. App'x 842, 845 (11th Cir. 2014) (collecting cases); *see also Princess Cruise Lines,* 657 F.3d at 1214-15.

The Court has already determined that arbitration is proper as to the Jones Act claims that are covered by the arbitration clause under the Convention.

### ii.    Jones Act Claims Not Under the Convention

The remaining Jones Act claims do not arise under the Convention, and therefore must be remanded. Plaintiff is correct that "[a]s a general rule, a Jones Act claim brought in a state forum may not be removed to federal court absent a showing the Jones Act claim has been fraudulently pled." *Bendlis v. NCL (Bahamas), Ltd*., No. 14-24731-CIV, 2015 WL 1124690, at *2 (S.D. Fla. Mar. 11, 2015). Defendants make no such allegations of a fraudulent pleading, nor does the Court make such finding. Jones Act claims may not be removed to federal court unless they are covered by the Convention. Accordingly, the Court remands the remaining Jones Act claim not covered by the Convention and not arising out of the arbitration agreement to state court: Count IV for Jones Act Failure to Treat against Non-Signatories Camper, Catlin and Gold.

### iii.    Remaining Claims

Defendants explain why there is federal jurisdiction for the claims arising under the Convention or under the Jones Act. However, they do not specifically spell out the basis for

jurisdiction for claims that would not arise from either. As detailed above, this Court compels arbitration as to the claims that arise under the Convention, including the Jones Act claims. This Court remands the remaining Jones Act claim to state court. This leaves the following claims in the case:

- Count II of the Complaint for Unseaworthiness against Defendants R. Operations, Fountainhead Marine Limited, and Lampert;

- Count VI of the Complaint for Conversion against all Defendants;

- Count V of the Complaint for Negligence against Camper;

- Count VII of the Complaint for breach of insurance contract against Camper and Catlin.

Here, Defendants are the removing party. They have the burden "to demonstrate that federal jurisdiction exists." *Kirkland*, 243 F.3d at 1281 n.5. The parties give no basis for federal jurisdiction on the above-mentioned Counts. Since Defendants did not meet their burden as to these claims, those claims are remanded to state court.

**E. Attorney's Fees**

Plaintiff requests fees and costs incurred as a result of the removal under 28 U.S.C. § 1447. Defendants argue that fees and costs should not be awarded as there was an objectively reasonable basis for the removal. ECF No. [20] at 8.

28 U.S.C. § 1447(c) states that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." However, the Supreme Court clarified that "absent unusual circumstances, attorney's fees [under 1447(c)] should not be awarded when the removing party has an objectively reasonable basis for removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 136, 126 S. Ct. 704, 708, 163 L. Ed. 2d 547 (2005); *see also MSP Recovery Claims, Series LLC v. Hanover Ins. Co.*, 995 F.3d 1289, 1296

(11th Cir. 2021). Because Defendants could remove at least parts of the action under 9 U.S.C. § 205 as arising under the Convention, this Court denies Plaintiff's request.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Compel Arbitration, **ECF No. [5]**, is **GRANTED IN PART** and **DENIED IN PART**.

2. This Court **COMPELS ARBITRATION** as to:

    a. Count I - Jones Act Negligence as to the Sea Bob incident against R. Operations, Fountainhead Marine Limited, and Lampert;

    b. Count III - Failure to Provide Maintenance and Cure in the aftermath of the Sea Bob incident against R. Operations, Fountainhead Marine Limited, and Lampert;

    c. Count IV - Failure to Treat as to Plaintiff's medical care after the Sea Bob incident against R. Operations, Fountainhead Marine Limited, and Lampert.

3. Plaintiff's Motion to Remand to State Court, **ECF No. [10]**, is **GRANTED IN PART** and **DENIED IN PART**.

4. This Court **REMANDS** the following claims to the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida for further proceedings:

    a. Count II - Unseaworthiness as to the fitness of the Yacht and of its crew against R. Operations, Fountainhead Marine Limited, and Lampert;

    b. Count IV - Failure to Treat as to as to Plaintiff's medical care after the Sea Bob incident against Camper, Catlin, and Gold;

Case No. 23-cv-24257-BLOOM/Torres

    c.   Count V – Negligence as to the safe and reliable operation of the Yacht and the training of the crew against Camper;

    d.   Count VI - Conversion as to the failure to return Plaintiff's personal effects against all Defendants;

    e.   Count VII - Breach of Insurance Contract as to the failure to pay Plaintiff's benefits under the insurance policy against Camper and Catlin.

5.   The Clerk of Court shall **CLOSE** this case for administrative purposes only.

6.   To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, February 15, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

40